[No. 15247.  *En Banc.*  March 5, 1919.]

# F. A. TWICHELL, *Appellant*, CHARLES E. HORTON, *Intervening Appellant*, v. THE CITY OF SEATTLE, AND PUGET SOUND TRACTION, LIGHT & POWER COMPANY, *Respondents*.[1]

MUNICIPAL CORPORATIONS (487)—PUBLIC DEBT—LIMITATIONS—PAYABLE OUT OF SPECIAL FUND. The purchase of a public utility under Rem. Code, § 8008, payable from the revenues of the utility, is not the creation of a municipal indebtedness within the meaning of the state constitution.

SAME (487)—"DUE REGARD" TO OPERATING EXPENSES—STATUTES. Under Rem. Code, § 8008, which authorizes the purchase of a public utility by payment from a special fund of: (1) a fixed proportion of the gross revenues of the utility; (2) a fixed amount out of and not exceeding a fixed proportion of such revenues; or (3) a fixed amount without regard to any fixed proportion; having "due regard to the cost of operation and maintenance," a city council, in purchasing a municipal street railway system under the third plan, is shown to have "due regard to the cost of operation and maintenance," where its ordinance recites that the revenue will be sufficient, in the judgment of the council, to meet all expenses of operation and maintenance and to provide all parts of the revenues pledged as a fund for the payment of bonds, warrants and other indebtedness and interest, payable out of the special fund, and redeem all bonds at maturity.

SAME. In such case, the finding of "due regard" exhausts the power of the city council with reference to the creation of the special fund, and the contract becomes fixed and settled as against such fund, in view of the latter part of Rem. Code, § 8008, requiring the city, upon adopting the third plan, to set aside the fixed proportion adopted, and authorizing suit to compel such action; and it is immaterial whether or not the ordinance creates a preference in favor of the bonds and interest out of the gross revenues of the system.

SAME (27)—POWERS OF COUNCIL—JUDICIAL SUPERVISION. In the purchase of a public utility, in exercising its judgment that the revenue will be sufficient to meet all expenses of operation and the purchase price, the council exercises a power over which the courts have no control; all presumptions being contrary to a claim that

[1]Reported in 179 Pac. 127.

the council acted arbitrarily and in disregard of the statute to have due regard for the expense of operation.

SAME (487)—PUBLIC DEBT—PAYABLE OUT OF SPECIAL FUND—PROVISION FOR OPERATING EXPENSES. In the purchase of a street railway system, no general municipal indebtedness is created by the fact that the ordinance for the purchase pledges the whole of the gross revenues of the system, if necessary, to pay the bonds and interest, which is made a first lien and charge on all the revenues superior to all other charges, including the cost of maintenance and operation.

CHADWICK, C. J., and MACKINTOSH, J., dissent.

Appeal from a judgment of the superior court for King county, French, J., entered January 14, 1919, dismissing an action to restrain a municipal purchase of a street railway system, upon sustaining demurrers to affirmative defenses. Affirmed.

*Piles & Halverstadt,* for appellant Twichell, contended, *inter alia,* that the provision of section 6 of the ordinance, providing that, ''even though the balance of such gross receipts thereafter remaining may be insufficient to pay the costs of maintaining and operating said system, additions, betterments and extensions'' clearly violates the provisions of the utility act, providing that the city shall have power to set aside ''a fixed proportion or amount'' of the revenue, having due regard to the cost of operation. *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888; *Schooley v. Chehalis,* 84 Wash. 667, 147 Pac. 410; *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998.

The city is restrained in fixing rates. *Twitchell v. Spokane,* 55 Wash. 86, 104 Pac. 150, 133 Am. St. 1021, 24 L. R. A. (N. S.) 290; *Feil v. Coeur d'Alene,* 23 Idaho 32, 129 Pac. 643, 43 L. R. A. (N. S.) 1095, 1104; *Ft. Dodge Electric Light & Power Co. v. City of Ft. Dodge,* 115 Iowa 568, 89 N. W. 7; *Denny v. Spokane,* 79 Fed. 719.

Under the ordinance, the city mortgages its existing system and creates a general indebtedness. 19 Ruling Case Law, p. 273, § 44; 27 Cyc. 976, 978; 5 McQuillin, Municipal Corporations, § 2230; *Leonard v. City of Metropolis,* 278 Ill. 287, 115 N. E. 813; *Lesser v. Borough of Warren,* 237 Pa. St. 501, 85 Atl. 839, 43 L. R. A. (N. S.) 839; *Browne v. Boston,* 179 Mass. 321, 60 N. E. 934; *Mayor etc. of Baltimore v. Gill,* 31 Md. 375; *Joliet v. Alexander,* 194 Ill. 457, 62 N. E. 861; *Swanson v. Ottumwa,* 118 Iowa 161, 91 N. W. 1048, 59 L. R. A. 620; *Eddy Valve Co. v. Town of Crown Point,* 166 Ind. 613, 76 N. E. 536, 3 L. R. A. (N. S.) 684.

*Donworth & Todd,* for intervening appellant Horton. The city could not for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property, without the assent of three-fifths of the voters. Const., art. VIII, § 6.

The so-called utility bonds constitute indebtedness within the meaning of the constitutional limitation and are void, because they exceed the debt limit and because they have not been submitted to or authorized by the voters. 1 Dillon, Municipal Corporations (5th ed.), p. 372, § 198; 5 McQuillin, Municipal Corporations, §§ 2228-2235; *Lovejoy v. Inhabitants of Foxcroft,* 91 Me. 367, 40 Atl. 141; *Scott v. Davenport,* 34 Iowa 208; *Spilman v. City of Parkersburg,* 35 W. Va. 605, 14 S. E. 279; *Levy v. McClellan,* 196 N. Y. 178, 89 N. E. 569; *Ramsey v. City of Shelbyville,* 119 Ky. 180, 83 S. W. 116, 1136, 68 L. R. A. 300; *Village of East Moline v. Pope,* 224 Ill. 386, 79 N. E. 587; *Schnell v. City of Rock Island,* 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874; *City of Ottumwa v. City Water Supply Co.,* 119 Fed. 315, 59 L. R. A. 604; *Earles v. Wells,* 94 Wis. 285, 68 N. W. 964, 59 Am. St. 885;

*Superior Manufacturing Co. v. School District 63, Kiowa County,* 28 Okl. 293, 114 Pac. 328, 37 L. R. A. (N. S.) 1054, and note, pages 1058, 1070; *Anderson v. International School District 5, Portal Tp., Burke County,* 32 N. D. 413, 156 N. W. 54, Ann. Cas. 1918A 506, L. R. A. 1917E 428; *Leonard v. City of Metropolis,* 278 Ill. 287, 115 N. E. 813; *Shuldice v. Pittsburg,* 251 Pa. 28, 95 Atl. 938; *Reynolds v. City of Waterville,* 92 Me. 292, 42 Atl. 553; *Beard v. Hopkinsville,* 95 Ky. 239, 24 S. W. 872, 44 Am. St. 222, 23 L. R. A. 402.

The so-called utility bonds, whether or not they are prohibited by the constitutional debt limit, are violative of the provisions of the code under which they purport to be issued; the council did not have ''due regard'' to the cost of operation, or comply with the statute by setting aside the whole of the gross revenues. Rem. Code, § 8008; High, Receivers (4th ed.), 394c; 22 Ruling Case Law, pp. 1125, 1127; *Fosdick v. Schall,* 99 U. S. 235; *Burnham v. Bowen,* 111 U. S. 776; *Southern R. Co. v. Carnegie Steel Co.,* 176 U. S. 257; *Bellingham Bay Imp. Co. v. Fairhaven & N. W. R. Co.,* 17 Wash. 371, 49 Pac. 514; *Cambria Iron Co. v. Union Trust Co.,* 154 Ind. 291, 55 N. E. 745, 56 N. E. 665, 48 L. R. A. 41; *Reynolds & Reynolds Co. v. Eacock,* 27 Ind. App. 459, 61 N. E. 732; *Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co.,* 48 Fed. 188; *Williamson's Adm'r v. Washington City, V. M. & G. S. R. Co.,* 33 Gratt. (Va.) 624; *New York Guaranty & Indemnity Co. v. Tacoma R. & Motor Co.,* 83 Fed. 365, and cases cited; *Carey v. Pittsburgh, Ft. W. & C. R. Co.,* 2 Ohio Dec. 85.

The so-called utility bonds, in pledging the income of the railway to their payment ahead of operating expenses, are invalid under the previous decisions of this court. *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888; *Kenyon v. Spokane,* 17 Wash. 57, 48 Pac. 783;

*Faulkner v. Seattle,* 19 Wash. 320, 53 Pac. 365; *Schooley v. Chehalis,* 84 Wash. 667, 147 Pac. 410; *Washington-Oregon Corporation v. Chehalis,* 76 Wash. 442, 136 Pac. 681; *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998; *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467; *State ex rel. Port Townsend v. Clausen,* 40 Wash. 95, 82 Pac. 187.

Under the statute, the whole transaction is void because not submitted to the voters and ratified by them. Rem. Code, § 8006. The contract of purchase and the so-called utility bonds are invalid because not authorized in accordance with the requirements of the budget and taxation provisions of the Seattle charter and the budget and taxation statutes. Seattle Charter, 1915, Article IX, §§ 10, 11; Laws of 1909, chapter 138, page 531; Rem. & Bal. Code, §§ 8346-8349; Rem. Code, §§ 9208-9211.

Ordinances numbers 39,070 and 39,071, providing for the trackage leasing arrangements with the subsidiaries of the traction company, the Puget Sound Electric Railway and Pacific Northwest Traction Company, cannot be lawfully executed without approval by the voters. Laws of 1917, chapter 137, page 573.

*Walter F. Meier, Thomas J. L. Kennedy,* and *Robert H. Evans,* for respondent City of Seattle, contended, among other things, that if the ordinance had pledged the entire gross revenues to the payment of the bonds, the city would only be doing what this court has said may be lawfully done under the statute. *Schooley v. Chehalis,* 84 Wash. 667, 147 Pac. 410; *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467; *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998; *Washington-Oregon Corporation v. Chehalis,* 76 Wash. 442, 136 Pac. 681.

The judgment of the city council as to due regard is conclusive. Rem. Code, § 8008; *Faulkner v. Seattle,* 19 Wash. 320, 53 Pac. 365; *Addystone Pipe & Steel Co. v. City of Corry,* 197 Pa. 41, 46 Atl. 1035, 80 Am. St. 812.

The presumption is that the city officials are proceeding in a lawful manner. *State ex rel. Smith v. Neosho,* 203 Mo. 40, 101 S. W. 99; *Brashear v. Madison,* 142 Ind. 685, 36 N. E. 252, 42 N. E. 349, 33 L. R. A. 474; *Poolman v. Langdon,* 94 Wash. 448, 162 Pac. 578.

A city may undertake to levy taxes for a term of years, to pay installments due annually for services as they are rendered, in which case the measure of the debt is the annual installment, not the aggregate amount. 1 Abbott, Municipal Corporations, pp. 321, 322, 340; Dillon, Municipal Corporations (5th ed.), §§ 193, 196; McQuillin, Municipal Corporations, §§ 2218-2233; 19 Ruling Case Law, § 279; *Hagan v. Commissioners' Court of Limestone County,* 160 Ala. 544, 49 South. 417, 37 L. R. A. (N. S.) 1027, and note, page 1063; *Walla Walla City v. Walla Walla Water Co.,* 172 U. S. 1; *McBean v. Fresno,* 112 Cal. 159, 44 Pac. 358, 31 L. R. A. 794; *Fidelity Trust & Guaranty Co. v. Fowler Water Co.,* 113 Fed. 560; *Ludington Water Supply Co. v. Ludington,* 119 Mich. 480, 78 N. W. 558; *City of Joseph v. Joseph Water Works Co.,* 57 Ore. 586, 111 Pac. 864; *Anoka Water Works Elec. Light & Power Co. v. Anoka,* 109 Fed. 580; *Stedman v. Berlin,* 97 Wis. 505, 73 N. W. 57; *Conner v. Marshfield,* 128 Wis. 280, 107 N. W. 639; Contra: *Schnell v. Rock Island,* 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874; *Lobdell v. Chicago,* 227 Ill. 218, 81 N. E. 354; *Benjamin v. Mayfield,* 170 Ky. 446, 186 S. W. 169; *Evans v. Holman,* 244 Ill. 596, 91 N. E. 723.

Neither is the exercise of the option to levy a current tax nor to pay from current funds the incurring

of an indebtedness; in other words, a current tax levy, or an expenditure of funds on hand, is not a debt. 19 Ruling Case Law, § 277 *et seq.;* McQuillin, Municipal Corporations, §§ 2215-2219; Dillon, Municipal Corporations (5th ed.), §§ 195, 197, 200; *Tate v. Elberton,* 136 Ga. 301, 71 S. E. 420; *People ex rel. James v. Martin,* 283 Ill. 380, 119 N. E. 296; *Waycross v. Tomberlin,* 146 Ga. 504, 91 S. E. 560; *Broussard v. Wilson* (Tex. Civ. App.), 183 S. W. 815; *People ex rel. Troubaugh v. Chicago & T. R. Co.,* 223 Ill. 448, 79 N. E. 151.

The constitutional limitation is against becoming indebted. The fact that a future legislative body may at its option levy a tax does not create a debt. It has this power anyway. *People ex rel. Talbott v. Toledo, P. & W. R. Co.,* 229 Ill. 327, 82 N. E. 420; *Swanson v. Ottumwa,* 118 Iowa 161, 91 N. W. 1048, 59 L. R. A. 620; *People ex rel. Scoon v. Chicago & A. R. Co.,* 253 Ill. 191, 97 N. E. 310.

Neither a fixed sum that may be payable upon the happening of a contingency, nor a sum that is not yet determined but which may in the future be determined, is a present debt within the meaning of the constitution. 1 Abbott, Municipal Corporations, pp. 321, 322, 345; Dillon, Municipal Corporations (5th ed.), p. 352, § 193; McQuillin, Municipal Corporations, §§ 2215, 2218, 2232, 2237; *State ex rel. Thomas v. Superior Court,* 42 Wash. 521, 85 Pac. 256; *In re Mayor of New York,* 72 N. Y. Supp. 378; *People v. Arguello,* 37 Cal. 524.

The purchase of a utility by means of "utility bonds" payable from the revenues of the utility, is not the creation of a debt within the meaning of the constitution. Rem. Code, § 8008; McQuillin, Municipal Corporations, § 2230; *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888; *Aylmore v. Seattle,* 48 Wash. 42, 92

Pac. 932; *Dean v. Walla Walla,* 48 Wash. 75, 92 Pac. 895; *Kenyon v. Spokane,* 17 Wash. 57, 48 Pac. 783.

The city has not obligated itself to continue operation of the system if a financial failure. It cannot become liable by an implied promise to operate, where the implied promise would result in an unconstitutional debt. *Litchfield v. Ballou,* 114 U. S. 190.

*James B. Howe, Hugh A. Tait,* and *John H. Powell,* for respondent Puget Sound Traction, Light & Power Company. The proposed transaction is within the power conferred upon the city council by the statute. McQuillin, Municipal Corporations, § 2219; *Faulkner v. Seattle,* 19 Wash. 320, 53 Pac. 365; *Addystone Pipe & Steel Co. v. City of Corry,* 197 Pa. 41, 46 Atl. 1035, 80 Am. St. 812; *State ex rel. Mutual Union Ins. Co. v. Fishback,* 97 Wash. 565, 166 Pac. 799; *Ewing v. Seattle,* 55 Wash. 229, 104 Pac. 259.

The consummation of the proposed transaction would not create a debt within the meaning of the constitution. *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467; *Seymour v. Ellensburg,* 81 Wash. 365, 142 Pac. 875; *Griffin v. Tacoma,* 49 Wash. 524, 95 Pac. 1107.

Where the liability may never arise but its future existence depends upon a contingency that may never happen, there is no debt. *Chicago v. Galpin,* 183 Ill. 399, 55 N. E. 731; *Keihl v. South Bend,* 76 Fed. 923; *Walla Walla City v. Walla Walla Water Co.,* 172 U. S. 1; *South Bend v. Reynolds,* 155 Ind. 70, 57 N. E. 706, 49 L. R. A. 795; *Saleno v. Neosho,* 127 Mo. 627, 30 S. W. 190, 27 L. R. A. 769; *Hagan v. Commissioners' Court of Limestone County,* 160 Ala. 544, 49 South. 417, 37 L. R. A. (N. S.) 1027, and note at page 1063.

The proposition that the city could not acquire the street railway property of the company without first submitting the matter to the voters has been decided

by this court against appellants' contention. *Shorts v. Seattle,* 95 Wash. 531, 164 Pac. 239; *Shorts v. Seattle,* 95 Wash. 538, 164 Pac. 241; *State ex rel. Peabody v. Superior Court,* 77 Wash. 593, 138 Pac. 277.

MITCHELL, J.—This action was instituted by appellant, F. A. Twichell, as a taxpayer, to restrain the respondents, the city of Seattle and Puget Sound Traction, Light & Power Company, a corporation, from entering into a contract whereby $15,000,000 of utility bonds, payable from the revenues of the entire system, as provided for by ordinances of the city, are to be delivered to the traction company by the city in payment for the street railway system of the traction company in the city, which system the city is seeking to acquire as an addition and betterment to, and extension of, the city's existing street railway system. He seeks further to enjoin the city from contracting for the purchase of electric energy for the operation of the street railway system, and also to enjoin the granting by the city of trackage rights to the Pacific Northwest Traction Company and the Puget Sound Electric Railway Company, called, respectively, the Everett and Tacoma interurbans, which have been operating their cars over the street railway tracks of the traction company within the limits of the city of Seattle; all things thus sought to be restrained being within and pursuant to the terms of an agreement between respondents.

To consummate its entire plan, the city passed four ordinances. The first one, No. 39,025, specifies and adopts the system or plan of additions, betterments and extensions of the city's existing street railway system, provides for the acquisition of and payment for the street railway lines, property and equipment

of the traction company and issuing bonds in payment therefor; and creates a special fund to pay the principal and interest of such bonds. This ordinance sets out a form to be substantially followed for the bonds and coupons.

The second ordinance, No. 39,069, is the purchase contract ordinance. It provides for the making of the contract of purchase and sale between respondents whereby the traction company sells to the city its entire street car system and property in the city for the sum of $15,000,000, payable in the utility bonds provided by ordinance No. 39,025, and sets out *in haec verba* a copy of the proposed contract. This ordinance also provides for a contract whereby the city agrees to purchase electric power from the traction company for the operation of the city's street railways and pay for the same for a term of years.

The third ordinance, No. 39,070, provides for the making of an agreement with the company for the operation of interurban cars and trains of the Puget Sound Electric Railway (Tacoma Interurban) over certain of the tracks of the street car system to be acquired, among other things, in protection of the traction company's existing contract with the interurban railway company. And the fourth ordinance, No. 39,071, is similar to No. 39,070 only it relates to the Pacific Northwest Traction Company, known as the Everett Interurban.

By his amended complaint, appellant Twichell, after alleging the contract for the purchase and sale of the property of the traction company for the sum of $15,-000,000, payable in utility bonds, pleads by number, title, and date of passage and approval, each of the four ordinances hereinbefore referred to, and then sets out with particularity much of the substance and

effect of the ordinances and the plan and intentions of the respondents in support of the averment that the proposed bond issue, according to the manner and form outlined in the ordinances, is contrary to the power of the city under its charter and the laws of the state, threatening indebtedness of the city in excess of the amount permitted by the constitution of the state, and that the city intends to, and unless restrained will, issue and deliver said bonds to the traction company. He demands that the city be enjoined from issuing and delivering the bonds and that respondents be enjoined from completing the contract for the sale and purchase of the street car system and property.

To the amended complaint, the city answered with appropriate denials, and by affirmative answer and defense alleged that it already owns and operates a municipal street railway system and intends to acquire the system of the traction company to be operated in connection therewith; that, in order to adopt a plan for the acquisition of additions, and to acquire and operate the system of the traction company as an addition, betterment and extension of its present street railway system, it passed the ordinances referred to in the amended complaint, which ordinances are made a part of the city's answer by appropriate reference and by setting them out *in extenso,* attached as exhibits A, B, C and D. The answer of the traction company to the amended complaint is to the same general effect as the answer of the city. To each of the affirmative answers and defenses, appellant Twichell demurred on the ground that the same, as it appears upon the face thereof, does not constitute a defense to the cause of action set out in the amended complaint.

After the filing of the answers, intervening appellant, Charles E. Horton, as a taxpayer, filed a complaint in intervention in the action. Other than the allegation that none of the provisions or plans of either of the four ordinances involved was ever submitted to the voters, and that the three ordinances other than the bond ordinance are drawn more positively and completely into the controversy, if possible, the complaint in intervention, while exhibiting more detail and particularity, may be taken, for the purposes of this case as we view it, similar to the amended complaint of Twichell. To the complaint in intervention, each respondent filed a general demurrer. The trial court sustained the demurrers of respondents to the complaint in intervention and overruled the demurrers to the affirmative answers and defenses of respondents to the amended complaint of Twichell. Appellant and intervening appellant each electing to stand upon the issues as made, the trial court entered a judgment of dismissal, from which this appeal is prosecuted by both complainants.

The principal contentions in the case center upon ordinances No. 39,025 and No. 39,069. Section 8005, Rem. Code, authorizes any incorporated city or town within the state, among other things, to construct, condemn and purchase, purchase, acquire, add to, maintain, operate or lease cable, electric and other railways within the limits of such city or town for the transportation of freight and passengers, and to fix, alter, regulate and control fares and rates to be charged thereon. Section 8006 of the code provides that, whenever the city council shall deem it advisable that the city shall purchase, acquire or construct any public utility mentioned in § 8005, it shall provide therefor by ordinance specifying the system or plan

proposed and the estimated cost thereof and submit the same to the qualified voters, except in certain cases where no submission shall be necessary, as follows:

"(1) When the work proposed is an addition to, or betterment of, or extension of, or an increased water supply for, existing water-works, or an addition, betterment or extension of an existing system or plant of any other public utility mentioned in section 8005 hereof, for which no general indebtedness is to be incurred by such city or town  . . .  ; or

"(2) Where in any charter of any city or town in the state of Washington heretofore or hereafter adopted by a vote of the people, an article or provision has been adopted authorizing the city council or other corporate authorities of such city to provide by ordinance for acquiring, opening or operating any of said public utilities, for which no general indebtedness is to be incurred by such city or town."

The city of Seattle has a charter, art. 4, section 18, subdiv. 15 (a) of which confers upon the city council the right, by ordinance, to exercise certain powers, similar to those granted by § 8005 of the code. Section 8008 of the code provides:

"Whenever the common council or other corporate authorities of any such city or town shall be authorized to exercise any of the powers conferred by section 8005 hereof without submitting any proposition as provided in subdivision first and second of section 8006 hereof, the common council or other corporate authorities shall have power to create a special fund or funds for the sole purpose of defraying the cost of such public utility or addition, betterment or extension thereto, into which special fund or funds the common council or other corporate authorities of such city or town may obligate and bind the city or town to set aside and pay a fixed proportion of the gross revenues of such public utility, or any fixed amount out of and not exceeding a fixed proportion of such revenues, or a fixed amount without regard to any fixed pro-

portion, and to issue and sell bonds or warrants bearing interest not exceeding six per centum per annum, payable semi-annually, executed in such manner and payable at such times and places as the common council or other corporate authorities of such city or town shall determine, but such bonds or warrants and the interest thereon shall be payable only out of such special fund or funds.''

The city, by ordinance No. 39,025, upon declaring that public interest and welfare require that the city acquire the street railway lines, property and equipment of the traction company as additions and betterments to and extensions of its existing municipal street railway system, determines and specifies the amount available for the payment out of the gross revenues into a special fund for the payment of the $15,000,000 bonds and interest; adopts and specifies, by setting forth in detail, the plan or system proposed; gives the number, amounts and dates of maturity of the bonds, bearing interest at five per cent per annum, stating:

''Said bonds shall be an obligation only against the special fund created and established in section 5 of this ordinance;''

Section 5 creates and establishes a special fund to be called ''Municipal Street Railway Bond Fund, 1919,'' into which the gross revenues of the municipal street railway system shall be paid for the payment of the bonds and interest; and in the form of the proposed bond set out in the ordinance it is stated that it is payable ''solely out of the special fund of the city of Seattle known as the 'Municipal Street Railway Bond Fund, 1919,' '' created and established by the ordinance. As to the contract ordinance, No. 39,069, it requires no notice here other than to say it provides for the purchase and sale pursuant to the

plan contained in ordinance No. 39,025, and that the consideration to be paid by the city is the sum of $15,000,000 in utility bonds, as authorized by that ordinance.

Viewed in the light thus far given, appellants may not complain, for the purchase of a public utility payable from the revenues of the utility is not the creation of a debt within the meaning of the constitution. Rem. Code, § 8008; *Dean v. Walla Walla,* 48 Wash. 75, 92 Pac. 895; *Seattle v. Stirrat,* 55 Wash. 560, 104 Pac. 834, 24 L. R. A. (N. S.) 1275; *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998.

Appellants contend, however, that because of certain provisions of the ordinances and of the statute, now to be noticed, a general indebtedness is contemplated or involved; and also, that the proposed transaction may not be consummated without the ratification of the voters. If the completion of the purchase and sale as planned would create a general debt, it would doubtless require the sanction of the voters of the city, otherwise not so. Section 8008, already referred to, in speaking of the special fund to be created by the city council, further provides:

"In creating any such special fund or funds the common council or other corporate authorities of such city or town shall have due regard to the cost of operation and maintenance of the plant or system as constructed or added to, and to any proportion or part of the revenue previously pledged as a fund for the payment of bonds, warrants, or other indebtedness, and shall not set aside into such special fund a greater amount or proportion of the revenue and proceeds than in their judgment will be available over and above such cost of maintenance and operation and the amount or proportion, if any, of the revenue so previously pledged."

In connection with this statutory provision, our attention is called to certain provisions of the plan or system ordinance, No. 39,025, in section 5 thereof, to the effect that the city, after providing for the special fund,

"does hereby irrevocably obligate and bind itself to pay into such fund out of the gross revenues of the municipal street railway system"

sufficient to meet the payments of interest and principal of the bonds as they fall due, stating the amounts and maturity of the same,

"and such fixed amounts out of such gross revenues are hereby pledged to such semi-annual payments of interest and such annual payments of principal, and shall constitute a charge upon such gross revenues superior to all other charges whatsoever, including charges for maintenance and operation;"

and the obligation of the city in the bonds to pay them with interest, although out of the special fund,

"even though the balance of such gross receipts thereafter remaining may be insufficient to pay the cost of maintaining and operating said system and said additions and betterments thereto and extensions thereof."

We are not persuaded by the argument of appellants in support of this contention. One will notice, from that portion of § 8008 of the code first quoted herein, that there are three methods by either of which the city council may determine the amount to set aside and pay out of the special fund for the utility bonds, viz.: (1) a fixed proportion of the gross revenues of the public utility; (2) a fixed amount out of and not exceeding a fixed proportion of such revenues; or (3) *a fixed amount without regard to any fixed proportion.* The latter, or third plan, is the one adopted by the city council in the present case and

manifestly, from the standpoint of power, the city council was fully authorized to prefer and adopt it. Now, having adopted that plan, it became necessary, under the directions and mandate of § 8008 of the code, in *creating* the special fund and specifying the amount to be set aside into it to be used in paying for the utility, to have due regard to the cost of operation and maintenance of the system as constructed or added to and to any proportion or part of the revenues previously pledged, and not to set aside into such special fund a greater amount than in the judgment of the city council will be available over and above the cost of operation and maintenance and revenues previously pledged.

The city council kept the statute in mind, for section 2 of ordinance No. 39,025 contains the following:

"The gross revenues to be derived from the operation of the municipal street railway system of the City of Seattle, including the additions and betterments to, and extensions thereof, herein provided for, at the rates of transportation charged, and to be charged, upon the entire system, will be sufficient in the judgment of the council and of the corporate authorities of the city to meet all expenses of operation and maintenance, including the operation and maintenance of the proposed additions, betterments and extensions, and to provide all proportions or parts of revenues previously pledged as a fund for the payment of bonds, warrants and other indebtedness, with interest thereon, heretofore made payable out of the revenues of the existing municipal street railway system, and to permit the setting aside in a special fund, out of the gross revenues of the entire system, amounts sufficient to pay the interest on the bonds hereby authorized to be issued, as such interest becomes due and payable, and to pay and redeem all of such bonds at maturity."

And further on in the same ordinance, with particularity and detail, are set out the amounts and maturity of the bonds and interest.

The *"due regard"* clause of the statute is a guide to point the way—a curb or limitation upon the manner in which the city council shall exercise its judgment in determining the fixed amount of the gross revenues derived from the utility to constitute the special fund for the payment of the utility. The finding, and expression of judgment of the city council in that portion of the ordinance just above set out, reflects observance of the *"due regard"* clause of the statute; and when the city council has thus proceeded and determined, it has exhausted its power with reference to the creation of the special fund, and the contract becomes fixed and settled as against that fund. Whether or not the ordinance and bonds provide for a preference in favor of the bonds and interest out of the gross revenues of the system is unimportant to the integrity of the obligations, as demands upon the special fund, because the latter part of § 8008 of the code covers the matter by providing as follows:

"When any such special fund shall have been heretofore or shall be hereafter created and any such obligation shall have been heretofore or shall hereafter be issued against the same, . . . a fixed amount without regard to any fixed proportion, of revenue shall be set aside and paid into said special fund as provided in the ordinance creating such fund, and in case any city or town shall fail to thus set aside and pay said fixed proportion or amount as aforesaid, the holder of any bond or warrant against such special fund may bring suit or action against the city or town and compel such setting aside and payment."

In noticing the decisions of this state, it will be borne in mind that, by the whole of § 8008 of the code, that portion thereof as to the manner of cre-

ating the special fund is applicable whether the proposition has been submitted to the voters or not, provided no general indebtedness is to be incurred. In the case of *Griffin v. Tacoma,* 49 Wash. 524, 95 Pac. 1107, it was said:

"The same ordinance also created such special fund by setting aside from the gross revenues all proceeds derived from the water works system now belonging to, or which may hereafter belong to, the city *at least fifty per cent thereof,* exclusive of revenue for water used by the city for municipal purposes, and *provided that all moneys so set aside and placed in such special fund shall be applied solely to payment for the aforesaid construction, and to other expenses necessarily incidental to such construction.*"

In the case, the record of which has been examined, the opposition to the plan contended that the city was at liberty, because of the words "at least fifty per cent thereof," to put the whole of the gross revenues into that special fund, leaving the operation and maintenance of the plant necessarily to be paid out of the general revenues of the city. However, further on in the opinion it was said:

"It is next suggested that the proposed pledging of the water receipts and the transfer from the general to the special fund, will obligate the city for new indebtedness which it cannot incur by reason of the constitutional limitation upon that subject. This court has already held that the mere pledge of the water receipts as a special fund does not create a debt against the municipality within the meaning of the constitutional inhibition. *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888; *Faulkner v. Seattle,* 19 Wash. 320, 53 Pac. 365; *Dean v. Walla Walla,* 48 Wash. 75, 92 Pac. 895."

This case has often been cited and relied on since, in this state.

The later case of *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467, was a case in which the ordinance, after providing for a special fund derived from the gross revenues of the municipal railway for paying the principal and interest of the utility bonds, provided:

"All the moneys so set aside and placed in said fund shall be applied solely to the payment of the obligations issued against the same, with interest thereon, . . ."

In the opinion the court held such plan did not create a debt, and specifically referred to and relied upon the case of *Griffin v. Tacoma, supra.*

The case of *Schooley v. Chehalis,* 84 Wash. 667, 147 Pac. 410, was a case involving two kinds of funds, one a general fund and the other a special fund, which latter was to meet the payment of interest and principal of the public utility bonds, and the ordinance provided that the latter or special fund

"Should be used solely for the purpose of paying the principal and interest of the bonds issued against the water system, and that such bonds should be a first and direct lien on the entire gross revenues of the water system."

In the case it was contended by the party opposing the bond issue that the money the city was to pay for the purchase of the old water system, to be taken over by the new plan, would constitute an indebtedness of the city which, taken in connection with indebtedness already existing, would exceed the constitutional limit. But the court held otherwise because, by the plan of the city, the amount to be paid for the old water works was made a charge upon the revenues of the water system, following the rule announced in earlier cases in this court, including the case of *Faulkner v. Seattle,* 19 Wash. 320, 53 Pac. 365.

In the case of *Faulkner v. Seattle,* the same conten-
tion was made as is made in the case at bar (except
here there is no showing or allegation as to what the
expenses of operation and maintenance would be) and
the court said:

"It is conceded that bonds issued only against a
fund to be created from the revenues of the system
would not create a debt against the city. *Winston v.
Spokane,* 12 Wash. 524 (41 Pac. 888). But it is con-
tended in this case that under the allegations of the
complaint a debt would be created because the city
proposes to bind itself to devote 75 per cent. of the
gross receipts to the payment of the bonds and that it
further appears that the remaining 25 per cent. would
not be sufficient to cover the operating expenses of the
system. But, conceding this to be true, we are of the
opinion that it does not appear that any debt would be
created by the contract."

The statutes and decisions above referred to recog-
nize a marked distinction between the creation of a
debt and the creation of a condition upon which a debt
might arise. In this case we have to do only with
the question of the power of the city, not matters of
propriety or policy. Neither the complaints nor the
ordinance advise one what proportion of the antici-
pated gross revenues is considered sufficient to meet
the obligations for the payment of the traction com-
pany's property, and the consequent remainder for ex-
penses of operation and maintenance. By the ordi-
nance, one is simply told that, in the judgment of the
city council, the gross revenues will be sufficient for
all such purposes. In exercising that judgment, the
city council exercises a legislative power over which
the courts have no control. *Ewing v. Seattle,* 55 Wash.
229, 104 Pac. 259.

We are satisfied the proposed plan and bonds will
not create any indebtedness against the city and that

the city council has authority to consummate the purchase without the sanction of the qualified voters.

What we have already said disposes adversely of another contention of appellants that, in pledging the whole of the gross revenues of the street railway system, if necessary, to pay the bonds and interest, the city council acted arbitrarily and in disregard of the statute to have due regard for the expenses of operation and maintenance of the system. All presumptions are contrary to such claim, while the ordinances and allegations of the complaints, as already seen, are wholly wanting in the discovery or statement of any facts suggesting arbitrariness on the part of the city council.

As to the contract for electric power provided for in ordinance No. 39,069 the city finds and declares the necessity therefor, for the purpose of operating the street railway system subsequent to the additions and extensions proposed. The ordinance and contract provide:

"Payment for power for which the city is obligated hereunder to pay in each calendar month, shall be made on the 25th of the next succeeding calendar month *from the revenues derived from the municipal street railway system.*"

The contract is within the power of, and its desirability within the judgment of, the city council.

As to the agreement contained in ordinance No. 39,070, concerning the Puget Sound Electric Railway, commonly called the Tacoma Interurban, the ordinance recognizes a traffic agreement outstanding between the traction company and the interurban railway, recites that effective, regular and expeditious interurban train service is of advantage to the public, and gives the interurban the right, upon certain ex-

pressed terms and conditions, to a joint user with the city of certain of the tracks of the municipal street railway system, specifically declaring it to be "granting a mere right to the railway to operate its cars over certain portions of said system." The ordinance further provides:

"All payments required of the city hereunder shall be paid only out of the revenues of the municipal street railway system."

We understand this is not a lease of any of the municipal street railways necessitating the calling for bids within the contemplation of ch. 137, Laws of 1917, p. 573. The agreement provided for by the ordinance does not divest the city of dominion over the property or even relieve it of the burden of maintenance and repairs. It is but a traffic agreement, the interurban railway company paying for "trackage rights" on a "car mile" basis.

Ordinance No. 39,071, relating to the Everett interurban railway, is similar to the other and requires no other notice here.

All four of these ordinances are designed to accomplish the main purpose of the acquisition by the city of the traction company's street railway property as an addition to, and extension of, the already existing municipally-owned street car system, according to the power and authority granted by the statutes and the city charter. All of the ordinances are closely interrelated, and each of the last three tie and refer to the plan or system ordinance No. 39,025 by containing specific reference thereto. We are satisfied the power of the city has been exercised in the manner provided by the law. That inquiry limits the province of the court.

It results that the judgment appealed from must be, and it is, affirmed.

HOLCOMB, MAIN, FULLERTON, TOLMAN, PARKER, and MOUNT, JJ., concur.

CHADWICK, C. J., and MACKINTOSH, J. (dissenting)— We agree with the majority opinion in this:

"We have to do only with the question of the power of the city, not with matters of propriety or policy."

We have no doubt of the right of the city of Seattle to take over and operate as a proprietor existing street railways, but its power to acquire and operate public utilities is to be found in the statute. Beyond the statute it cannot and should not be allowed to go. We have more than once held that a statute defining the rights and powers of a municipal corporation have the same force and effect as a constitutional limitation upon the powers of the state legislature.

That it was the intent of the legislature to deny the governing body of a municipality the right to charge either the cost, or the cost of maintenance and operation of a public utility upon the general funds of a city seems too plain for argument. The power to acquire is found in § 8005. Subdivision 1 of § 8006 provides for the acquisition of public utilities for which *no general indebtedness is to be incurred.* Subdivision 2 provides that public utilities may be acquired under apt provisions of a city charter and *for which no general indebtedness is to be incurred.*

"If a general indebtedness is to be incurred, the amount of such indebtedness and the terms thereof shall be included in the proposition submitted to the qualified voters as aforesaid and such proposition shall be adopted and assented to by three-fifths of the

qualified voters of the said city or town voting at said election."

It is only where no general indebtedness is to be incurred that the council or governing body may proceed without first submitting the proposition to the people. In other words, the legislature has by positive and unmistakable mandate said to the governing bodies of our municipalities, "You may acquire, maintain and operate public utilities where no charge is to be made against funds raised by general taxation, but if you intend to, or the scheme employed may, charge the general revenues you must have the sanction of a popular vote."

To save the right of the general taxpayer and the one who may find employment in the maintenance and operation of the utility and to protect the general funds the legislature was careful to provide as follows:

"In creating any such special fund or funds the common council or other corporate authorities of such city or town *shall have due regard to the cost of operation and maintenance* of the plant or system as constructed or added to, *and to any proportion or part of the revenue previously pledged as a fund for the payment of bonds, warrants, or other indebtedness, and shall not set aside into such special fund a greater amount or proportion of the revenue and proceeds than in their judgment will be available over and above such cost of maintenance and operation* and the amount or proportion, if any, of the revenue so previously pledged." Rem. Code, § 8008.

The law being in intent, letter and spirit that a public utility acquired without a vote of the people shall be paid for out of the earnings of the utility, "having due regard to the cost of maintenance and operation," it cannot be held that without a vote of

the people the city council can pledge the entire gross revenues to the payment of the initial cost. To do so strikes out and nullifies the words *"proportion or part"* and the limitation that the council *"shall not set aside into such special fund a greater amount or proportion of the revenue and proceeds than in their judgment will be available over and above such cost of maintenance and operation."* In other words, before the power to set aside a fund can be exercised at all the council must have due regard for, which can mean nothing else than that it shall reserve, a sum sufficient in its judgment to defray the cost of maintenance and operation.

In this case the gross revenues are set aside without reservation; they are to be paid into a special fund and the bonds and indebtedness are made a first charge against the entire fund. The traction company may take all under its contract. In the working out of this scheme the council has proceeded not with "due regard" for the "cost of maintenance and operation" but, as said by counsel for one of the appellants, in positive disregard of the statute.

The reasoning of the court that the council has proceeded under a third alternative; that is, that it may set aside "a fixed amount without regard to any fixed proportion," is illogical. The meaning of that alternative is no more than this: That if the city council does not see fit to set aside a certain proportion measured in percentages it may set aside a fixed amount, but it does not follow that it can do so in disregard of a sufficient amount reserved to reasonably meet the cost of maintenance and operation. If the legislature had intended that the words "fixed amount" or "greater amount" should have the same meaning as the words "gross revenues" it would have

so declared, and if it had so intended we may assume that it would have left unwritten the greater part of the act wherein it is provided, not once but many times, that the cost of maintenance and operation are a first charge and that they must be paid out of the revenues unless the people by a vote upon that question decide otherwise. But the statute defines the term "amount." It gives it a certain meaning when it couples the words "amount" and "proportion." The law says that the council shall not set aside a greater "amount or proportion" of the revenues and proceeds than will be available over the cost of maintenance and operation. The ordinance wilfully disregards this mandate, for there is not warrant either express or implied for the setting aside of any part of the gross revenues for the payment of the cost exclusive of the cost of maintenance and operation. It is said that the bond buyers will not buy bonds that are not a first charge upon the gross revenues. We are not concerned with the whims of money changers. They should find their remedy at the bar of the legislature and not at the bar of the court. If the argument had any legal merit it might be answered by saying, "Men will not contribute their labor and services to maintain and operate unless they are guaranteed payment out of the gross revenues of the utility."

The decisions of this court do not sustain the majority opinion. In *Griffin v. Tacoma,* 49 Wash. 524, 95 Pac. 1107, the ordinance provided that the officers of the city should set aside as a special fund from the gross revenues "at least fifty per cent thereof." In *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467, the court tolerated what seemed to be to the writer an evasion of the statute holding that the city might

make a loan from one fund to another to be paid out of the gross revenues of the utility; the particular question of maintenance and operation was not discussed. The court did say, however, that the statute

"gives the common council the power to create a special fund for the sole purpose of defraying the cost of the public utility 'into which special fund' the common council may obligate the city to pay a *fixed proportion of the gross revenues* of the utility and to issue and sell interest-bearing bonds or *warrants* payable *only* out of such special fund."

*Schooley v. Chehalis*, 84 Wash. 667, 147 Pac. 410, is not in point. The ordinance in that case provided for a fund to be used for the purchase *and maintenance* of a water system. There was no question of the payment of maintenance and operation out of the general fund, the court assuming that the city council would, in the event that it should be found that the rates then established were insufficient to *maintain the plant and pay interest and principal upon the bonds,* raise its rates until the revenues would be sufficient to maintain the system and also to take care of the maturing principal and interest of the bonds.

In so far as these cases hold and the court now holds that the creation of a debt for the purchase of a public utility is not a general indebtedness, we can agree, but it is only so where the law is observed and provision is made for the maintenance of the plant out of its own revenues. If it is not so provided the charge is a debt. It is no answer to the plain mandate of the statute to say that, although the gross revenues are "irrevocably" pledged to the payment of the bonds and the interest thereon, the city council has provided that:

"*The gross revenues* to be derived from the operation of the municipal street railway system of the

City of Seattle . . . *at the rates of transporta-
tion charged and to be charged . . . will be suf-
ficient in the judgment of the council and of the cor-
porate authorities of the city to meet all expenses of
operation and maintenance, including operation and
maintenance* of the proposed additions, betterments
and extensions, and to provide all proportions or
parts of revenue previously pledged as a fund for
the payments of bonds, warrants and other indebted-
ness, with interest thereon, heretofore made payable
out of the revenues of the existing municipal street
railway system, and to permit the setting aside in a
special fund, out of the gross revenues of the entire
system, amounts sufficient to pay the interest on the
bonds hereby authorized to be issued, as such interest
becomes due and payable, and to pay and redeem all
of such bonds at maturity.''

The law requires that the judgment of the council
shall be expressed in ''amounts'' or in ''propor-
tions,'' and for the city council to so opine and at the
same time irrevocably obligate and bind itself to pay
into such fund the gross revenues of the municipal
street railway system, ''even though the balance of
such gross receipts thereafter remaining may be in-
sufficient to pay the cost of maintaining and operating
said system and said additions and betterments
thereto and extensions thereof,'' is to deny its faith
in its own ''judgment.'' It is but a subterfuge and
a pretense and should not be sanctioned by the courts.

The legal effect of the majority opinion is that all
of the gross revenues are pledged to the payment of
the purchase price; that if the one who renders labor
or service as a motorman, conductor or about the
tracks and barns of the railway system is to be paid
he may be paid out of the general revenues; that, in-
stead of taking *his pay* in a warrant which is a first
charge upon the gross revenues as the law contem-

plates, he may not, if the gross revenues are insufficient to meet the maturing bonds and interest, have his pay out of the earnings of the utility at all, but must take his chances with a general fund warrant which may be subject to discount and unless sanctioned by subsequent decree of this court will be of doubtful validity.

The ordinances but clumsily conceal the reserved purpose of the council to "maintain and operate" the street car system at the expense of the general fund, either by a system of loans from the general fund, or by levying a direct tax for that purpose.

It has been said that "the power to govern is the power to tax" and that "the power to tax is the power to destroy", but our legislative bodies have wisely put limitations upon that power. They should not be lightly disregarded, for as the power of taxation is essential to government its abuse is likewise destructive of government. Tax measures or measures that may result in a general tax if their purpose be accomplished should be expressed in fair and unmistakable terms. That the power to tax should not be abused or exercised through indirect methods, the legislature wisely provided that no plan for the acquisition of a public utility which directly or indirectly made or contemplated, or in its exercise might be a charge to be met by general taxation, should be adopted without an approving vote of those who might be called upon to pay the tax.

If the council did not intend to charge the general fund it might have said so in words. It might have had "due regard for the costs of maintenance and operation" as the statute directs by reserving an "amount or proportion" of the revenues of the utility, or being mindful of a possible charge, it should

have submitted the measure to the people. The net result of the ordinances as construed by the court is that the cost of maintenance and operation has not been provided for. By the employment of an indirect method dressed for the occasion in a cloak of words the law is circumvented, and the people whose right of participation and self determination was so carefully safeguarded, have been denied the sovereign right of the franchise.

It was suggested in consultation that the council could raise the rate charged for fares, and thus meet the cost of maintenance and operation out of the revenues of the street car system. Counsel made no such suggestion, as of course they could not, for with the gross revenues of the system pledged irrevocably to the payment of the purchase price, the seller or the bondholder, as the case may be, can insist that the gross revenues belong to him, whether they are accumulated by a charge of five, seven, ten or fifty cents for a single fare.

Whether it is wise for the city of Seattle to purchase the property of the traction company, is not of our concern. That is a matter for those who live in that city. That they may be charged for the upkeep and operation of the street car system is not denied. Our insistence is that before we make it possible—and this is the statute as we read it—they should be heard either in affirmation or negation of the plan.

To hold that the gross revenues of the system may be irrevocably pledged to the payment of the purchase price as a first charge and then to say that, in the judgment of the council, the gross revenues will pay the cost and the costs of maintenance and operation is to nullify the statute and put a premium on eva-

sion, pretext, subterfuge, quibbling and equivocation for the expression of such opinion is not a setting aside or a reservation of an ''amount or proportion'' to meet these charges. In other words, in case of suit, the city would be bound by its irrevocable promise and not by its gratuitous opinion.

The law was designed to cover not alone what is, but what may be. The plan, as outlined by the ordinances, is a corruption of the statute providing for the acquisition of public utilities, and a direct assault upon the law which provides in terms that the owner of property shall not be called upon to pay a tax upon his property unless three-fifths, or a majority, of the voters, as the case may be, shall so decree.

Believing that the ordinance was drawn with intent to, or whether with intent it does, in legal effect, charge the general fund, or leaves the way open to levy a direct tax, thus violating the letter and spirit of the law, we are constrained to dissent.