[No. 12002.  Department One.  August 12, 1914.]

## STANLEY T. SCOTT et al., Appellants, v. THE CITY OF TACOMA, Respondent.[1]

MUNICIPAL CORPORATIONS — INDEBTEDNESS — BONDS — DIVERTING FUNDS—VALIDITY.  Where a city, in providing for the construction of a municipally owned street railway, to be equipped and operated by an existing railway company on a percentage basis, adopted, by ordinance, a plan to transfer to the special railway fund receipts of the city from percentages paid by street railway corporations as franchise taxes, in case the gross revenues from the operation of the street railway were not sufficient to pay principal or interest on bonds and warrants when due, and limiting the liability of the city to the special fund, the sums so loaned to be repaid out of the gross revenues of the street railway as the same shall accrue, the transfer of a portion of the franchise tax is not the incurring of a municipal indebtedness in violation of the constitutional limitation, but a loan to the special fund under control of the city and which fund has an assured income.

SAME—POWER TO TRANSFER FUNDS—STATUTES—CONSTRUCTION. Rem. & Bal. Code, § 8008, authorizing the common council to create a special fund to defray the cost of a public utility, into which fund the city may be obligated to pay a proportion of the revenues of the city, and to issue interest bearing bonds or warrants payable only out of such special fund, does not limit the fund to receipts from the utility to be created.

CHADWICK, J., dissents.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered April 18, 1914, in favor of the defendant upon the pleadings, in an action for an injunction. Affirmed.

[1]Reported in 142 Pac. 467.

*C. M. Riddell* and *Hayden, Langhorne & Metzger*, for appellants.

*T. L. Stiles* and *Frank M. Carnahan*, for respondent.

*The Attorney General* and *L. L. Thompson, Assistant, amici curiae.*

GOSE, J.—This is an action by taxpayers to enjoin the issuance of certain municipal bonds. There was a judgment in favor of the defendant on the pleadings. The plaintiffs have appealed.

The essential facts disclosed by the pleadings are these: The city of Tacoma, in pursuance of a power conferred by the public utilities act (Rem. & Bal. Code, § 8005 *et seq.;* P. C. 77 § 1073) in April, 1913, passed an ordinance providing for the construction, equipment and operation of a municipally owned street railway on South Eleventh street between Pacific avenue and the easterly limits of the city. At an election called for that purpose, the ordinance was approved by the majority of the electors voting thereat. Thereafter the city council adopted Ordinance No. 5,713, providing for the creation of the Tacoma street railway fund No. 1, and for the issuance of bonds and warrants thereon in the sum of $35,000, with which to construct such street railway line; and authorizing the sale or other disposition of the bonds or warrants. Sections 2 and 3 of the ordinance are as follows:

"Section 2. Beginning with the operation of said street railway and thereafter while any of the obligations hereinafter mentioned are outstanding and unpaid, the city treasurer shall set aside and pay into said Tacoma Street Railway Fund No. 1, the gross revenues derived from the operation of said street railway, or so much thereof as shall be necessary to pay the principal of the outstanding obligations hereinafter mentioned and the semi-annual interest thereon in seven years from August 1, 1914, as hereinafter provided. All the moneys so set aside and placed in said fund shall be applied solely to the payment of the obligations issued against the

same, with interest thereon, and the city of Tacoma hereby
irrevocably binds itself not to sell said street railway until
the said obligations, with the interest thereon, shall be fully
paid; or, in case it shall sell said street railway before such
payment, it binds itself to pay all of said obligations and in-
terest thereon out of any moneys derived from such sale, and
that in any event it will not sell said street railway for a sum
less than enough to pay said obligations and interest.

"Section 3. Should the gross revenues from the operation
of said street railway not be sufficient to pay the principal or
interest upon any of said obligations when the same, or either
of them, become due and payable, there shall be transferred
into and loaned to said fund, out of the moneys received by the
city of Tacoma from percentages paid by street railway cor-
porations as franchise taxes, such sum or sums as may be nec-
essary to make up the deficiency; which sums so loaned shall
be repaid out of the gross revenues of said street railway
as the same shall accrue." Tacoma Ordinance, No. 5,713.

Section 6 of the ordinance limits the liability of the city to
the special fund. It is conceded that the city of Tacoma is
indebted in a sum in excess of one and one-half per cent of the
assessed value of the property therein subject to assessment,
according to the last assessment roll for municipal purposes.
It is also conceded that the electors have not authorized the
construction of a street railway upon credit. The city has
entered into an agreement with the Tacoma Railway and
Power Company, which owns and operates all the present
street railway lines in the city, whereby that company agrees
to equip the proposed railway and operate it with full trans-
fer privileges, and pay to the city four per cent on the cost
of the line and one-half of the net earnings. The agreement
runs for seven and one-half years. The income from the sys-
tem during the life of the contract will more than pay the
interest on the bonds. The pleadings allege that, at the ex-
piration of the agreement, there is every reason to believe that
it can be extended if the city desires. Upon the basis of the
agreement, the bonds would be retired within twenty-four
years.

It is contended that the proposed transfer of a portion of the franchise tax will create a debt, the argument being that a transfer of the franchise tax will necessitate the levying of a general tax to meet the sum withdrawn. Under the terms of its franchise, the Tacoma Railway and Power Company pays to the city five per cent of its gross freight earnings and two per cent of its gross passenger earnings, aggregating more than $20,000 a year, and it is a portion of these revenues that the city proposes to loan to the street railway fund.

We think the case is controlled by *Griffin v. Tacoma*, 49 Wash. 524, 95 Pac. 1107. In that case, the city was enlarging and extending its water system in pursuance of an ordinance authorizing it so to do. The ordinance created a special fund by setting aside at least fifty per cent of the gross revenues of the water system, and provided that all moneys so set aside and placed in such special fund should be applied solely to the expenses of enlarging the system. On the same day, the city passed another ordinance by the terms of which it transferred from the general fund of the city to the special fund the sum of $100,000, as a temporary loan from the general fund to the special fund. The income from the water system was about $20,000 a month. In holding that the proposed plan did not create a debt, the court said:

"It is next suggested that the proposed pledging of the water receipts and the transfer from the general to the special fund, will obligate the city for new indebtedness which it cannot incur by reason of the constitutional limitation upon that subject. This court has already held that the mere pledge of the water receipts as a special fund does not create a debt against the municipality within the meaning of the constitutional inhibition. *Winston v. Spokane*, 12 Wash. 524, 41 Pac. 888; *Faulkner v. Seattle*, 19 Wash. 320, 53 Pac. 365; *Dean v. Walla Walla*, 48 Wash. 75, 92 Pac. 895. We have also seen from what has already been said that the transfer from one fund to the other creates no indebtedness against the city. It is a mere temporary loan to a fund, with an as-

sured income, whose sources of supply are entirely under the control of the city. The city's general funds are not thereby in fact reduced, inasmuch as the credit of the general fund for the temporary transfer is the equivalent of cash as a working asset, and no new debt of the city arises."

The appellants seek to distinguish the *Griffin* case upon the ground that, in that case, the special fund had an assured and certain income from an existing plant; whilst in this case, the railway is not yet constructed, and it is argued that the income of the system is uncertain. The point actually decided in the *Griffin* case was that the transfer from one fund to another fund with an assured income was in the nature of a loan and created no indebtedness against the city.

The *Attorney General* has filed a brief as *amicus curiae*, in which he questions the soundness of the distinction which the appellants seek to make, saying that, in the *Griffin* case, the city had complete control of the fund to which the loan was made, the same as in the present case. He seeks to distinguish the case at bar from the *Griffin* case on the ground that, in the *Griffin* case, the loan to the special fund was made by virtue of a separate ordinance which was not incorporated in the contract made with the bondholders, while in the case at bar, the same thing was accomplished by a single ordinance, pledging a portion of the franchise taxes. We are not impressed with this attempted distinction. The same thing was accomplished in both cases. In the *Griffin* case, the city loaned $100,000 from the general fund to the special fund, the latter fund being pledged to its repayment. In this case, the city pledges not to exceed fifty per cent of the revenue derived from the franchise taxes to the special fund, and obligates the special fund to return it. In this case, as in the *Griffin* case, the special fund is under the control of the city and has an assured income. If the loan did not constitute a debt in the *Griffin* case, the pledge of the franchise tax does not constitute a debt in the case at bar.

Cases have been cited from other jurisdictions which hold

that a pledge of existing property or its revenue to acquire a new public utility creates a debt. The contrary was held in the *Griffin* case. Other cases are cited which hold that the laying of a tax running through a series of years for a like purpose is the creation of a debt. That question is not before us. We are not called upon to decide whether the special fund theory is extended beyond its logical limits in the *Griffin* case. The rule which it announces has, no doubt, been followed by many municipalities in the state in acquiring or extending public utilities. This being true, the doctrine of *stare decisis* should obtain. We think the proposed plan falls within the principle announced in the *Griffin* case.

The *Attorney General* suggests that the special fund authorized under the public utilities act (Rem. & Bal. Code, § 8008; P. C. 77 § 1078) is limited to the receipts from the utility to be created, and that the city has no authority to use any other money for that purpose. We do not so read the statute. It gives the common council the power to create a special fund for the sole purpose of defraying the cost of the public utility "into which special fund" the common council may obligate the city to pay a fixed proportion of the gross revenues of the utility and to issue and sell interest-bearing bonds or warrants payable *only* out of such special fund. We do not read this language as limiting the fund to the revenues of the utility.

The judgment is affirmed.

CROW, C. J., ELLIS, and MAIN, JJ., concur.

CHADWICK, J. (dissenting)—The decision of the lower court and the opinion of the majority can be sustained only by reference to the case of *Griffin v. Tacoma*, 49 Wash. 524, 95 Pac. 1107. That case is wrong, as I believe the majority of the court would be willing to admit if the question were now presented for the first time. It is wrong for the reason that it permits the constitution to be overridden by a resort to bookkeeping methods. Too many cases have been decided by

this and other courts justifying municipal corporations, which, through necessity or design, have violated the plain provisions of the constitution limiting indebtedness. The result has been untold confusion. Almost every contemplated municipal activity is brought to this court in some preliminary way by friendly suit, and no man knows whether a municipal obligation is valid or invalid until this court has pronounced a final judgment. The majority of my associates are unwilling to overrule the *Griffin* case, believing that it would tend to invalidate possibly millions of dollars in securities and obligations issued by our municipal corporations since the rule was announced. This may well be doubted. If this case involved no more than a rule of practice, the position of the court would be well taken. The situation is more serious. It depends upon an authority no less than the constitution itself. The people have undertaken to fix the limit of municipal indebtedness and it seems to me that, when it has become apparent to the court that to further extend the doctrine to meet seeming necessities or new municipal activities, we are inviting a greater and more hopeless confusion. Instead of finding a way around the constitution in such cases, the better way would be to amend or repeal the constitution; for, if the present practices are to continue, it seems to me that the constitutional limitations upon indebtedness will become, if indeed they have not already become, dead letters.

The exceptions that have been made by municipal corporations under the sanction of the courts are not found in the constitution except by forced construction. Until we get back to the provisions of that document fixing limitations upon indebtedness, we can expect no settled law, and this court will be even more constantly called upon to act as ministerial advisers of city councils. We will be required to pass upon their bookkeeping methods and to say what is lawful or necessary and what is not lawful or necessary, as well as what is a solvent fund and what is not a solvent fund. In the *Griffin* case, the court made solvency the test, whereas, the people

in plain words, Art. 8, § 6, Constitution of Washington, had made a percentage of assessed valuation—the amount of indebtedness without reference to solvency—the test. The reasoning of the court in the *Griffin* case finds a parallel in this: "A" owns property which he believes to be worth $10,000. He borrows $5,000. Upon present estimates, he is solvent, *ergo*, he is not in debt. There would be great comfort in this reasoning if the thing we have decided is no debt could not be converted into a reality by the demand of a creditor. The effect of this decision will be to bring hundreds of purely municipal questions to this court, for no city attorney can advise, and no bond buyer feel secure, until we have said whether a contemplated indebtedness falls within the constitution or out of it, and whether the particular fund out of which the loan is to be made is solvent, for as was said by Judge Rudkin, Judge Fullerton concurring, in his dissent:

"The security may be good in this case, but it may be bad in the next, and the existence of the power cannot depend on the wisdom or folly that may accompany its exercise."

There could be no possible judicial question if we had insisted upon the observance of the constitution until it could be altered or amended in a regular way. The right of a municipality would depend upon a simple mathematical calculation. We have already come to the point where it is the law that a writing tablet is a necessity and a waste basket is not; that a borrowing from a fund with a theoretically *assured* income is no violation of the constitution, and by the same token a borrowing from a fund of *doubtful* income is. We have allowed ourselves to be led into a maze of nonjudicial questions. There is only one remedy, and that is to recur to fundamental principles. The present burden of public indebtedness is such as to call for an application of the limitations of the constitution as they are written. It may work a present hardship, but the remedy is not with the courts; it is in the people's own hand. If the constitutional limit is too low, it can be increased by amendment; or if the people

want to repeal the constitutional limitations upon public indebtedness, they can accomplish it without resort to the courts.

I have not cited or reviewed the numerous cases sustaining the methods employed in evading the constitution. They are known to every lawyer who is at all familiar with our decisions. I believe the *Griffin* case should be overruled, and therefore dissent from the opinion of my associates.