[No. 17132. *En Banc.* April 29, 1922.]

S. B. ASIA et al., *Appellants,* v. THE CITY OF SEATTLE
et al., *Respondents.*[1]

MUNICIPAL CORPORATIONS (490)—PUBLIC DEBT—SUBMISSION OF TO VOTE—OPERATIONS OF STREET RAILWAY. A city operating a street railway at a loss, cannot, without submitting the question to the voters, use its general funds in the operation of the road, where the road was acquired under Rem. Comp. Stat., §§ 8488, 8489, 8491, which authorized the city to acquire and operate the street railway through revenue derived from a special fund without incurring any general indebtedness, which was prohibited unless authorized by the voters (FULLERTON, J., dissenting).

Appeal from a judgment of the superior court for King county, Ronald, J., entered January 26, 1922, in favor of the defendants, in an action to enjoin the use of general funds in the operation and maintenance of a municipal railway system. Reversed.

*Tucker & Hyland, Preston, Thorgrimson & Turner,* and *Chadwick, McMicken, Ramsey & Rupp,* for appellants.

*Walter F. Meier, Thomas J. L. Kennedy, Charles T. Donworth,* and *Robert H. Evans,* for respondents.

*James B. Howe, Hugh A. Tait,* and *John H. Powell, amici curiae.*

[1]Reported in 206 Pac. 366.

Tolman, J.—Appellants, being residents and tax-payers of the city of Seattle, seek by this action to enjoin the city and its officers from the use of any of its general funds in the operation and maintenance of the street railway system which it acquired by purchase from the Puget Sound Light & Power Company, and from levying any tax for the purpose indicated. From a judgment denying the relief sought, after a trial on the merits, the case is brought here for review on appeal.

The matters involved all grow out of, and are the direct aftermath of the conditions set forth and discussed in *Twichell v. Seattle*, 106 Wash. 32, 179 Pac. 129, and reference should be had to that case for an understanding of this, and the opinion there should be read in connection with the opinion here.

This case was advanced here because of its importance to the city and its taxpayers. The record is voluminous; we have been favored with no abstract thereof, and withal, are expected to give an early decision. Under these conditions, we find it too burdensome to attempt to give an orderly and detailed statement of all the facts involved, but desire it to be understood that we have carefully considered and given due weight to such facts, disputed and undisputed, as materially affect the issues.

Following the decision in the *Twichell* case, the city completed the purchase of the street railway system under the terms therein indicated, went into possession, and proceeded to operate it. There has developed from the operation a condition which establishes beyond cavil that the city council was in error when, by Ordinance No. 39,025, considered in the *Twichell* case, it declared that, in its judgment and in the judgment of the corporate authorities, the gross revenues from

such operation would be sufficient to meet all expenses
of operation and maintenance, provide for revenues
previously pledged, and permit the setting aside in a
special fund of amounts sufficient to meet the interest
and principal of the bonds given in payment, according
to the terms agreed upon; a declaration which we were
then compelled to accept at its face value, and upon
which the result in the *Twichell* case is based. It now
appears that, aside from other deficits more or less dis-
puted, the city, in September, 1920, in order to meet the
interest upon the bonds, then due, overdrew the street
railway fund, which overdraft continued into Novem-
ber, 1920, when it exceeded one-half million dollars,
and in December, 1920, to help meet this overdraft, the
city definitely and specifically borrowed $83,000 from
its general fund, which was not repaid until nearly a
year later, and then without interest. Such was the
condition at the time this action was commenced, and
that condition, if the use of the general fund for such
a purpose be illegal, warranted the intervention of a
court of equity. Subsequent repayment will not stay
the hand of the court, especially where, as here, the
city asserts the right to repeat the operation whenever
it may see fit, and to pay operating and maintenance
charges out of its general fund, or out of funds raised
by general taxation, if it elects so to do.

The question then is, may the city voluntarily or
involuntarily encroach upon its general fund, or other-
wise place upon the taxpayers the burden of meeting
deficits of any kind incurred by reason of the carrying
out of the plan of purchase or the operation and main-
tenance of the system thereunder?

As recited in the *Twichell* case, Rem. Code, § 8005
(P. C. § 1214), gives to the city the right to acquire,
maintain and operate street railways. Section 8006,

Rem. Code (P. C. § 1215), requires the submission of any such proposition to the voters, except in certain cases where no general indebtedness is to be incurred. [Rem. Comp. Stat., § 8488, 8489.]  Section 8008, Rem. Code (P. C. § 1217), reads as follows:

"Whenever the qualified voters of any such city or town shall have heretofore adopted or shall hereafter adopt a proposition for any public utility as heretofore provided and either no general indebtedness shall have been authorized or the common council or other corporate authorities shall not desire to incur a general indebtedness, and whenever the common council or other corporate authorities of any such city or town shall be authorized to exercise any of the powers conferred by section 8005 hereof without submitting any proposition as provided in subdivision first and second of section 8006 hereof, the common council or other corporate authorities shall have power to create a special fund or funds for the sole purpose of defraying the cost of such public utility or addition, betterment or extension thereto, into which special fund or funds the common council or other corporate authorities of such city or town may obligate and bind the city or town to set aside and pay a fixed proportion of the gross revenues of such public utility, or any fixed amount out of and not exceeding a fixed proportion of such revenues, or a fixed amount without regard to any fixed proportion, and to issue and sell bonds or warrants bearing interest not exceeding six per centum per annum, payable semi-annually, executed in such manner and payable at such times and places as the common council or other corporate authorities of such city or town shall determine, but such bonds or warrants and the interest thereon shall be payable only out of such special fund or funds.  In creating any such special fund or funds the common council or other corporate authorities of such city or town shall have due regard to the cost of operation and maintenance of the plant or system as constructed or added to, and to any proportion or part of the revenue previously pledged

as a fund for the payment of bonds, warrants, or other
indebtedness, and shall not set aside into such special
fund a greater amount or proportion of the revenue
and proceeds than in their judgment will be available
over and above such cost of maintenance and operation
and the amount or proportion, if any, of the revenue
so previously pledged. Any such bonds or warrants
and interests thereon issued against any such fund as
herein provided shall be a valid claim of the holder
thereof only as against the said special fund and its
fixed proportion or amount of the revenue pledged to
such fund, and shall not constitute an indebtedness of
such city or town within the meaning of the constitu-
tional provisions and limitations. Each such bond
or warrant shall state upon its face that it is payable
from a special fund, naming the said fund and the ordi-
nance creating it. Said bonds and warrants shall be
sold in such manner as the corporate authorities shall
deem for the best interests of the city or town, and the
corporate authorities may provide in any contract for
the construction and acquirement of the proposed im-
provement that payment therefor shall be made only
in such bonds and warrants at par value thereof.

"When any such special fund shall have been here-
tofore or shall be hereafter created and any such ob-
ligation shall have been heretofore or shall hereafter
be issued against the same, a fixed proportion, or a
fixed amount out of and not exceeding such fixed pro-
portion, or a fixed amount without regard to any fixed
proportion, of revenue shall be set aside and paid into
said special fund as provided in the ordinance creating
such fund, and in case any city or town shall fail to
thus set aside and pay said fixed proportion or amount
as aforesaid, the holder of any bond or warrant against
such special fund may bring suit or action against the
city or town and compel such setting aside and pay-
ment." [Rem. Comp. Stat., § 8491.]

Without discussing the authorities there reviewed,
or repeating the arguments of or quoting from the
Twichell case, it is sufficient to say that we there held

that the judgment of the city council was conclusive and must be accepted by us until the contrary appeared, and therefore, by the ordinance providing for the acquisition and operation of the street railway system, no general indebtedness was created.

Unquestionably the statute means what it says, and says what it means, when it provides that no general indebtedness shall be created without the submission of that question to the voters, and that, in creating a special fund, the city shall have "due regard to the cost of operation and maintenance." Had it been contemplated that a general indebtedness might arise from the operation and maintenance, the language quoted would not have been used. *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998; *Schooley v. Chehalis,* 84 Wash. 667, 147 Pac. 410.

But it is contended that we have already recognized the right of the city to borrow from one fund to temporarily relieve another. *Griffin v. Tacoma,* 49 Wash. 524, 95 Pac. 1107; *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467; *Seymour v. Ellensburg,* 81 Wash. 365, 142 Pac. 875. The facts revealed by these cases differ radically, however, from the facts here. In the *Griffin* case, it was held that "A temporary transfer from the general fund to another fund with an assured income is not an appropriation or diversion." Neither of the other cases goes further. In the *Griffin* case the borrowing fund is described as "solvent." Here we have a special fund which owes many millions, a considerable deficit appeared almost immediately, and has steadily grown. None of the efforts of the city so far have resulted in providing an income sufficient to meet the outgo. If borrowing is continued, either directly or by overdraft, the final result will inevitably be that the moneys borrowed will be permanently diverted

from the fund to which they belong and appropriated to the use of the utility, just as certainly as though such an appropriation were directly made in the first place. That which may not be done directly must not be accomplished by indirection. When, as here, the court can certainly see a final unlawful result, it should enjoin the act by which the unlawful result will otherwise be accomplished.

We are not now concerned with questions other than the one before us, and are not called upon to advise the city how, if at all, it may solve the very serious problem which has arisen from what has proven to be the erroneous judgment of its legislative body; but we are clear that only one construction can be placed upon the statute which governs this situation, and that is that when it is proposed that any general indebtedness be incurred for such a purpose as is here considered, the matter must be submitted to the voters; and if not so submitted, all obligations arising from the acquisition, operation and maintenance of the utility must be met from its revenue, and, in any event, by no action of the city or its officials can the burden be shifted to the shoulders of the taxpayers, who have had no opportunity to say whether they will or will not accept the hazard. The trial court should have granted the prayer of appellants and enjoined the city and its officials from in any manner encroaching upon the general fund or placing the burden in any degree upon the taxpayers.

Reversed and remanded.

PARKER, C. J., MAIN, HOLCOMB, HOVEY, MITCHELL, and BRIDGES, JJ., concur.

MACKINTOSH, J. (concurring)—As was attempted to be shown in the dissenting opinion in the *Twichell* case, the declaration under which the city purchased the car system was in its very nature false, and experience has

now proved this. We should never have allowed ourselves to accept as binding the statement that one can lift himself by his own boot straps, no matter how solemnly or by whom made. I agree with the result of Judge Tolman's opinion, which I do not understand to pass directly or indirectly upon the power of the people of Seattle in any manner to now convert the obligation created by the contract of purchase into a charge upon the general fund.

FULLERTON, J. (dissenting)—I am unable to concur in this opinion. My first reason is that the question decided is moot. Contrary to the statement in the opinion, I do not find from the record that there is a deficit constantly arising from the operation of the railway system. There was such a deficit at one time, it is true, and the city used certain money of its general fund to meet it. But since that time transportation rates have been increased, and this has enabled the city not only to meet the obligations of the system as they have accrued, but to repay the money so used, and I do not find that the record shows that the earnings of the system will not take care of all of its obligations as they arise in the future. The question determined is an important one, and the court should not invite its consideration; it should consider it only after it actually arises.

My second reason is, that I think the court has reached an erroneous conclusion on the question determined. If it be that there is a constantly increasing deficit between the revenues of the railway system and its accruing obligations, the question confronting the city is one of expediency. If it cannot meet these obligations, it must abandon the plant and suffer it to go back into hands of the holders of the obligations given

for its purchase price. This must mean its ultimate abandonment. The railway cannot be operated longer as a private enterprise. If the city, with the plant freed from the burden of taxation, with power to protect it from direct competition, with power unhampered to fix rates of transportation, and with power to protect itself against extravagant losses arising from accidents, cannot make the income of the plant cover the cost of operation and upkeep, it is idle to say that a private concern, which has not these advantages, and which must make a reasonable return on its investment, if it operates at all, can do so. It is no answer to say that the operation of street railways has been profitable in the past. The argument overlooks the change in conditions. When street railways were first put in use, and for a long time thereafter, they were the sole means of transportation. Now they have an indirect competition against which there is no protection, whether publicly or privately owned. Business and professional men generally, and many mechanics and artisans, who formerly patronized the street cars, now ride to and from their homes and their places of work in their own conveyances. Private conveyances are now the adjuncts of many homes; the members of which, who formerly patronized the street cars, now ride altogether in such private conveyances. One has but to glance at the streets of any considerable city to know that the loss of patronage arising from these causes has made large inroads into the revenues of street railway systems. It is a competition that will increase rather than diminish as time goes on, and the loss of patronage caused thereby, as I understand the situation, is the principal reason why so many street car systems are now unable, with reasonable rates of fare, to make an adequate return on their investments.

·.But there are in all cities, and there are in the city
of Seattle, many thousands of people, who live at dis-
tances from their places of. work,. who cannot afford
these private conveyances.   These, if they are not to
be compelled to abandon their present residences, must
have transportation of some sort at reasonable rates.
This then is the city's problem; shall it continue or
abandon this means of transportation.   It is a question
of public welfare, in which all of the people of the city
are concerned, and, in my opinion, is a question which
the duly chosen representatives of the city have the
power to decide.   If they conclude that it is to the pub-
lic interest that the existing railway system be operated
rather than abandoned, they have the power to operate
it, even though the operation may require the use of
money from the city's general fund.   I can see no force
in the argument that such a use of the general fund
will operate indirectly to the payment of the purchase
price of the system.   The question, to my mind, is be-
yond that.   The city now has control of the system and
is now operating it, and the real question is, is it to
the public interest that it continue to do so.   If an ap-
propriation from the public fund. obligated the city in
any way to pay the remainder of the purchase price
a different question would arise.   But it can have no
such effect.   If in the future it may be determined that
the public interest requires the abandonment of this
means of transportation and the resort to some other,
the city will be at liberty to do so, unhampered by any-
thing arising from the particular act.

If I understand the majority, I am afraid the rem-
edy suggested is hardly available.   By the fundamental
laws, the power and control of municipal affairs are
vested generally in elective officers; it is only special
matters that are to be submitted to the electors.   I can

find no law authorizing this matter to be submitted to the electors, and before it can be done, there must be additional fundamental legislation.

In my opinion, the proceedings should be dismissed.