[No. 21970.   *En Banc.*   May 28, 1930.]

J. G. VON HERBERG, *Appellant*, v. THE CITY OF SEATTLE
*et al., Respondents.*[1]

*Bausman, Oldham & Eggerman, O. B. Thorgrimson,*
and *Otto B. Rupp,* for appellant.

*Thomas J. L. Kennedy* and *A. C. Van Soelen*
*(Arthur Schramm,* of counsel), for respondents.

[1]Reported in 288 Pac. 646.

BEALS, J.—J. G. Von Herberg instituted this action in the superior court for King county against the city of Seattle and certain administrative officers thereof, alleging that he was a resident, citizen and taxpayer of the city of Seattle, owning real and personal property located therein; that he was the owner of city railway fund warrants issued by the city of Seattle aggregating approximately $100,000, which warrants were issued December 24, 1926, were payable from the city railway fund and had been stamped by the city treasurer "not paid for lack of funds;" that the warrants had been issued to employees of the municipal street railway in payment of wages due them and had been cashed by plaintiff and assigned to him.

Plaintiff also alleged the facts concerning the purchase by the city of Seattle, January 10, 1919, from Puget Sound Traction, Light & Power Company, of its street railway system, as theretofore operated by that company in the city of Seattle, and the facts concerning such purchase and the issuance of bonds therefor, as stated by this court in the cases of *Twichell v. Seattle,* 106 Wash. 32, 179 Pac. 127, and *Asia v. Seattle,* 119 Wash. 674, 206 Pac. 366, which cases should be read as furnishing the background of the case at bar.

Plaintiff also alleged that the warrants above referred to were issued because the city was setting aside all of the revenues arising from the operation of the railway system and placing the same in the municipal street railway bond fund for the purpose of meeting the semi-annual interest on the purchase bonds and the payment on account of the principal, due March 1, 1927, under the agreement for the purchase of the railway; that the city had set up on the books of the street railway certain depreciation charges amounting for the years 1919 to 1926, both inclusive, to a little over $5,-300,000, but that in fact the actual depreciation suf-

fered by the physical property pertaining to the railway system was greatly in excess of the amount so set up by the city on its books, and that no provision had been made for establishing an adequate fund or reserve for accrued depreciation, and that it would be impossible for the city to take care of the depreciation of the railway system or make necessary replacements, if the gross earnings of the railway were first applied to the payment of principal and interest on the purchase price bonds as the same matured.

The complaint further alleged that the municipal railway was and always had been, since its purchase by the city, insolvent; that its assets were always less than its liabilities, and that, December 31, 1926, there was a deficit in the street railway fund amounting to over $300,000; that the statement contained in the ordinance pursuant to which the purchase bonds were issued, to the effect that, in the judgment of the city council and the authorities of the city, the earnings of the railway would be sufficient, in addition to paying the principal and interest of the bonds as they should mature, to pay all expenses of operation and maintenance, was an arbitrary statement made without investigation or knowledge, and was entirely erroneous and without basis in fact, and that such statement was made without due regard to the necessary costs of operation and maintenance.

Plaintiff further set forth a schedule of alleged unpaid liabilities due from the railway and its approximate daily receipts, and alleged that the rolling stock and equipment was old and antiquated and that need existed for immediate replacements, which would require the expenditure of over a million dollars; that the gross revenues of the railway were decreasing, and that the operating expenses were increasing; and that it was the duty of the city and its officers to pay the

cost of operation and maintenance of the railway out of the gross revenues thereof, before making payments on account of the purchase price bonds; and that, if the city and its officers were allowed to do in the future as they had in the past, to wit, set aside the gross revenues of the system for the purpose of paying interest on the bonds and a portion of the principal thereof, plaintiff and all the taxpayers of the city and all holders of warrants drawn on the city railway fund would suffer great loss.

For a second cause of action, plaintiff alleged that the city had diverted moneys from others of its special funds, to wit, from the water fund and one of the light funds, to the city railway fund, which moneys had not been returned to the creditor funds, and that defendants, unless restrained, would proceed to use the money of other utility funds for the purpose of diverting the same to the municipal railway fund; that plaintiff was the owner of a bond issued by the city and payable out of the city municipal light and power plant fund, and was the owner of another bond issued by the city payable out of the water fund, and, as such bond owner, was injured by the diversion of money from such funds to the municipal railway fund. Plaintiff's amended complaint is voluminous, and contains further allegations of similar purport.

Plaintiff prayed that the defendants be enjoined from using any of the gross revenues of the railway system for the payments of interest on the purchase bonds or any portion of the principal thereof, until the cost of operation and maintenance of the railway had first been paid, and that defendants be enjoined from diverting moneys from any utility fund, including the two funds above referred to, to the city railway fund.

The city answered, admitting the transfer of certain money from the railway fund into the railway bond fund, admitting that there were outstanding warrants against the railway fund and that certain moneys had been loaned from the light and power funds, as alleged by plaintiff. The judgment in the *Twichell* case was also pleaded as *res adjudicata*.

The city also, by way of a cross-complaint and bill of interpleader, pleaded the purchase contract between the city and Puget Sound Power & Light Company, a corporation, and brought that company into this action, alleging its interest in the subject-matter thereof. The power company then removed the cause from the state court to the United States district court, which court maintained its jurisdiction, overruling plaintiff's motion to remand. After a trial in that court and dismissal of the action, on the merits, upon appeal to the circuit court of appeals, that court held that jurisdiction to try the cause pertained to the state court, and reversed the decree appealed from, with instructions to remand. *Von Herberg v. Seattle,* 27 Fed. (2d) 457.

In due time, the cause came on for trial before the superior court, where much testimony was taken on behalf of the respective parties, the trial court ruling that the questions presented by plaintiff's first cause of action had become moot by reason of the fact that plaintiff's warrants had been called and paid, and that the second cause of action should be dismissed, because, as the court found, the street railway fund was solvent, and for the further reason that the evidence failed to show that plaintiff, as the owner of bonds issued by the special funds which had advanced money to the railway fund, had been injured, as the funds whose bonds plaintiff owned were solvent.

From a decree dismissing the action, plaintiff ap-

peals, assigning error upon the dismissal by the court of his two causes of action, as set forth in his complaint.

That the municipal railway fund warrants purchased by appellant from the respective payees named therein had been by the city called and paid prior to the trial, is not disputed. Appellant argues that the cause of action has not become moot by reason of such payment, because they were paid out of funds the right to use which he is contesting, as the money with which the warrants were paid was received by the street railway fund by way of a loan or advancement from the city light fund.

In view of this contention, we shall first consider the legality of the loans, or transfer of funds, to the street railway fund, of which appellant complains in his second cause of action.

In the first place, appellant contends that the loans, or transfers, were without warrant of law and illegal, for the reason that the street railway fund, "the debtor fund to which the loans were made," is insolvent or in imminent danger of insolvency, appellant arguing that he is in a position to complain of the alleged illegal loans or advancements because he is the owner of two bonds issued respectively by the funds from which the money was transferred.

In support of this contention, appellant relies upon the case of *Asia v. Seattle, supra,* in which case this court directed the issuance of an injunction restraining the city from in any manner encroaching upon the general fund for the purpose of assisting the railway fund, the court holding that "all obligations arising from the acquisition, operation and maintenance of the utility must be met from its revenue," the voters having had no opportunity to express by their franchises whether or not they would accept the hazard of

the operation of the railway as any possible charge against the general fund.

In the case at bar, the trial court, after an exhaustive hearing, found that the street railway fund was solvent. A careful examination of the record convinces us that this finding was correct, and that the record before us does not justify the reversal of this finding made by the lower court. The evidence upon this phase of the case was conflicting, voluminous and complicated, experts testifying on each side, and much argument being addressed to questions such as the proper method of computing depreciation, the condition of the physical property of the railway system, the proper standpoint from which to view the balance due on the purchase price in considering the questions of depreciation and present solvency, and similar questions.

Without entering into an extended discussion of these matters, which would extend this opinion to an unreasonable length, we approve the finding of the lower court to the effect that, at the time of the trial, the municipal street railway was solvent.

This court, in the case of *Griffin v. Tacoma*, 49 Wash. 524, 95 Pac. 1107, upheld a transfer by way of a temporary loan from the general fund of the city to a special fund established for the payment of the cost of a portion of its water system. It was held that the proceedings of the city were regular, and that the plaintiff was not entitled to restrain the same by injunction. The court notes that the transfer was made in the nature of a temporary loan and the transaction was held to be entirely regular and in accordance with law. It appears that, in the case at bar, the ordinances of the city providing for the loans to the railway fund provide for temporary loans only, and for the repayment by the railway fund to the creditor funds, respectively, as soon as money shall be available in the

railway fund. The case last cited was discussed and approved in the later cases of *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467, and *Seymour v. Ellensburg,* 81 Wash. 365, 142 Pac. 875.

Appellant cites the case of *State ex rel. Case v. Howell,* 85 Wash. 281, 147 Pac. 1162, in which this court referred to the first two of the cases last cited, and noted that neither of the cases related to transfers from special funds, and that, consequently, whether or not transfers as loans from special funds would be valid, remained an open question. The case of *Griffin v. Tacoma* is also referred to by this court in the case of *Savage v. Tacoma,* 61 Wash. 1, 112 Pac. 78, in which this court, referring to the *Griffin* case, said:

"It is almost apparent from the record of that case that there was no real controversy between the parties, but that the case was instituted as a moot case in order to determine a favorable construction of the contract, and thus forestall any controversy thereafter."

Appellant also relies upon the case of *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998, in which this court said:

"The legislature has not provided, neither has it given authority to the council, to treat the general fund as a banking fund to be loaned, as it were, to an independent enterprise, to be repaid upon the happening of a contingency."

Conceding that the case of *Griffin v. Tacoma, supra,* is not determinative of the question presented here, we are, nevertheless, of the opinion that the rule laid down in that case should be followed where applicable, the court having in the case of *Scott v. Tacoma* refused to depart from the doctrine of the *Griffin* case in spite of a vigorous dissent on the part of one of its members. Believing, as we do, that the *Griffin* case is not con-

trolling as to the issues now presented, we are, nevertheless, of the opinion that it is extremely persuasive.

The problems confronting the municipal authorities of the city of Seattle in connection with that city's municipal street railway system are many and of extreme difficulty. In considering questions such as are here presented, concerning the exercise by the officers of a city of authority and control over municipal affairs, courts are slow to interfere with such officers in the exercise of their judgment in dealing with the numerous difficult municipal problems which present themselves for solution. Unless in such cases it clearly appears that the city officials are transcending their authority and violating the law, courts will be slow to restrain or limit their action by injunction or otherwise. Of course, if it appears definitely that municipal officers are proceeding in violation of law, the courts will unhesitatingly interfere, but such violation must clearly and affirmatively appear, and will not be presumed, nor will it be inferred from facts of doubtful import.

There are also other important considerations, which influenced the trial court, and which we deem relevant and important.

In his opinion dismissing this case upon the merits after its trial before the United States district court, Dietrich, Circuit Judge, before whom the case was tried, after discussing the issues raised by appellant's second cause of action, said:

"In addition to these considerations it is difficult to see how plaintiff, as a holder of the obligations of the light and water funds, could be injured without showing that after the borrowings in question from these funds, they would, upon the assumption that such borrowings are a total loss, be inadequate to discharge all obligations against them including plaintiff's holdings; and there was no attempt to make such showing. And

as a taxpayer, it seems to have been held plaintiff is without such interest in the special funds as would qualify him to seek the relief for which he prays. *Puget Sound P. & L. Co. v. Seattle,* 5 Fed. (2d) 393; *Von Herberg v. Seattle,* 18 Fed. (2d) 57, 60.

"At best, the officers have a most difficult and perplexing task in providing for the onerous financial obligations imposed by this railway enterprise to which the city is irretrievably committed, and in the absence of a showing of imminent peril to substantial legal rights, a court of equity ought not to add to their difficulties by undertaking to prescribe in advance of urgent need the limits of their discretion in meeting temporary emergencies. And no such showing is here made.

"Accordingly the bill will be dismissed."

The circuit court of appeals for the ninth circuit, on appeal from a decree of the district court dismissing a suit brought by Puget Sound Power & Light Company against the city of Seattle and this appellant, which suit was also heard by Judge Dietrich, says:

"Nor do the allegations stated impress us as a justification for the opinion of the plaintiff that the city construes the contract in a way other than as its terms require. The presumption that the city will be governed by the true chart of its duty far outweighs the conjecture that it will do otherwise; hence we see no present necessity for judicial interference." 29 Fed. (2d) 254.

It is, of course, true that this language was used in connection with a different phase of the Seattle municipal street railway problem, but we deem the language equally pertinent to the situation here presented.

It nowhere appears that the special funds from which moneys were transferred to the railway fund were, because of such transfers or for any other reason, insolvent or in the slightest danger of insolvency.

While this fact does not, in our opinion, preclude appellant from maintaining his action and contesting the legality of the acts of the mayor and city council in transferring moneys from one special fund to another, under the circumstances shown here, the situation in which the creditor funds are left is to be considered in determining the proper action to be taken by a court of equity upon such a state of facts as is disclosed by the record now before us. Loans, whether denominated temporary or not, or other transfers of money, which would leave a special fund substantially depleted or impaired or in danger of such impairment or depletion as would even threaten insolvency, might well invite remedial action by a court of equity, whereas similar transfers of money, which afford no basis for the contention that the creditor funds are substantially injured thereby or that there is any likelihood that creditors of such funds will suffer loss by the transaction, would afford no ground for the exercise by such a court of its equitable jurisdiction.

We deem the present action one in which appellant, as the holder of bonds issued respectively by the water fund and one of the light funds, seeks to enjoin the removal of moneys from such funds as a matter of absolute right, without showing any reasonable probability that by such action he will suffer direct damage or loss. Such a state of facts was presented by the record in the case of *Asia v. Seattle, supra,* as there a principle was involved, to wit, the possible subjection of the general fund of the city to loss or depletion on account of the purchase or operation of the municipal street railway system, without a vote of the people which would authorize the use of money pertaining to the general fund for such a purpose. This presented an abstract question of right or wrong, which did not depend upon the amount of money sought to be trans-

ferred or any question of special or particular private loss or damage. The questions here presented are in their nature essentially different, and must, to some extent at least, be considered by the courts from a different standpoint. We do not hold that the matters suggested above are the only matters to be considered, but that they are to be given weight, in connection with strictly legal questions, which have naught to do with questions concerning possible loss by appellant.

Believing, as we do, that appellant failed to establish by his evidence that the municipal street railway is insolvent, and granting appellant's right, as the holder of bonds issued, respectively, against each of the two funds from which loans were made to the railway fund, to litigate the legality of such loans, we hold that the doctrine laid down in the case of *Griffin v. Tacoma, supra,* should be applied to the case at bar, and that plaintiff has failed to make a case calling for the exercise on his behalf of the powers of a court of equity in, at this time, interfering with the city officials and holding that any of their actions, as shown by the record in this case, are in violation of law.

We now return to the first cause of action set forth in appellant's amended complaint, and to his contention that the city must pay out of the revenues of the street railway the operating expense in connection therewith, and the cost of labor, before it can pay any portion of the bonded indebtedness represented by the purchase price.

As we hold that appellant has failed to show that the loans made from the special funds above referred to to the street railway fund were made in violation of law, it follows that the warrants drawn against the street railway fund, which were acquired by appellant, were paid with money lawfully pertaining to the street railway fund, and by such payment the questions pre-

sented by appellant in his first cause of action became moot, and should not be decided in this action. We accordingly express no opinion upon the question of whether or not wages and operating expenses of the street railway must be paid before the application of any money in the street railway fund to the payment of the bonds evidencing the purchase price of the system.

We also hold that, upon the record before us, appellant's status as a citizen and taxpayer of the city of Seattle does not require that the question last discussed be in this proceeding determined.

The judgment appealed from is affirmed.

HOLCOMB, FULLERTON, MAIN, FRENCH, and MILLARD, JJ., concur.

TOLMAN, J. (dissenting)—The opinion of the majority so obviously and, to my mind, unwarrantably, extends the doctrine of *Griffin v. Tacoma,* 49 Wash. 524, 95 Pac. 1107, *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467, and *Seymour v. Ellensburg,* 81 Wash. 365, 142 Pac. 875, and so patently disregards what was decided in *Twichell v. Seattle,* 106 Wash. 32, 179 Pac. 127, and *Asia v. Seattle,* 119 Wash. 674, 206 Pac. 366, that I am unable to concur therein.

Its errors seem so apparent that I shall not attempt to follow and refute its arguments, but rather I shall treat the issues from the standpoint of the briefs and arguments as submitted to the court, for the reason that our previous holdings seem to have been misunderstood or misconstrued in a way which seems likely to work great ultimate harm, and under such conditions we ought not, except for the soundest reasons, to refuse to interpret our prior decisions.

At the outset, one or two important facts, not mentioned in the majority opinion, but which are admitted

or not denied, should be stated: First, that banks and business houses refused to accept or cash the warrants issued to the employees of the street railway system except at a discount which apparently would be prohibitive. Appellant, to relieve that situation, stepped in, voluntarily, and purchased warrants of the face value of $100,000 at par. Second, that appellant is the owner and holder of a $500 bond issued by the city and payable *only* out of the light and power fund, and is likewise the owner and holder of a $1,000 bond similarly issued, payable *only* out of the water fund; and, since the call and payment of his warrants out of moneys borrowed from these special funds, over his protest, he claims the right to maintain this action as the holder of such bonds and also as a citizen and a taxpayer.

Taking up the two questions presented in the order in which the majority has treated them, let us first consider the right of the city to borrow from special funds to relieve and maintain the street railway fund. Much evidence was taken, and many figures relating to the financial condition of the street railway fund were submitted by each side; the appellant showing a falling off in receipts from operations, an increase of operating expenses and attempted to show that insufficient had been allowed for depreciation. Upon the other hand, the city showed facts and figures from which it argues that the street railway fund is solvent, on a cash basis and able to meet all of its obligations. I cannot set forth here sufficient of these facts and figures to make intelligent a discussion of the question as to which position, if either, is right. Nor do I think that necessary to a determination of the issue presented. Insolvency is a harsh term, and the condition of insolvency is not to be presumed, but must be proven by clear and convincing evidence.

If we were considering a bank or commercial enter-

prise, then, under our well known definitions, we should be obliged to hold that insolvency was here established. But this is a far different business, and, in view of its public nature and the manifest uncertainty as to the value of its assets (depending in the main upon the ultimate outcome of its struggle for existence), while it is not unreasonable to fear that insolvency may result, yet, under all the circumstances, we cannot say that the evidence so far preponderates against the finding of the trial court on this subject as to warrant us in now holding that insolvency has been established.

Still, notwithstanding a theoretical or even an actual solvency, may the city continue to divert money from other special funds for the relief of this fund?

In approaching this question, it must always be borne in mind that a special fund is raised for, and is pledged to, a specific purpose, and that purpose forms the only basis for exacting the money from those who pay. Without that special and specific purpose, no money could be rightfully brought into the fund, and every dollar brought into the fund, whether needed immediately or not for a long time to come, is still to be sacredly set aside for the one and only purpose to which it has been devoted. If this be not true, then the city, under guise of establishing or maintaining one certain public utility, might raise a fund from the users of that utility and devote large parts of it to any foreign purpose within its municipal powers which its governing body might consider to be of advantage. For instance, water users might be, in spite of their protest, compelled to provide funds to initiate and maintain a municipal telephone system, or, as here, a municipal street railway system. Such a course is so manifestly unfair and so opposite to all legal principles as to call for condemnation by the courts.

But, says the city, these special funds are solvent.

It is certainly to be hoped so, but that does not in anywise affect the present question if the reasoning I have already indulged in is sound.

When the *Asia* case, *supra,* was tried it appeared that there had been borrowed from the general fund $83,000. When the issues were framed in this case, there had been borrowed $135,000 from the light fund, and $10,000 from the water fund. Later, $600,000 was borrowed from the light fund, and, at the time of the trial below, the street railway fund was indebted to the two special funds for moneys so borrowed in the sum of $900,000. Without going into unnecessary detail, it appears that never, at the times when payments were to be made on the purchase money bonds, has this fund had sufficient money for its needs, and that it has resorted to this temporary borrowing to meet its payments. After such payments were made in part, the sums borrowed have been repaid from operating receipts, but, speaking generally, a part of each temporary loan has been carried over and, if repaid at all, has been so repaid from the proceeds of a new temporary loan. As a result, at all times, the street railway system is doing business in part upon capital taken from other special funds in the guise of temporary loans.

It is said that, if the street railway fund be solvent, then, by our previous decisions, we are committed to the doctrine that such temporary loans may be made. *Griffin v. Tacoma,* 49 Wash. 524, 95 Pac. 1107, is the first case relied upon. There the question was as to the right to transfer money from the general fund to a special fund, which it was urged had been done in contravention of the terms of the charter of the city of Tacoma. This court there said:

"It is not provided that moneys which have been collected for the general fund for general municipal

purposes may never, in the interest of expediting the city's business, be temporarily transferred to a special fund; but it is provided that no fund shall ever be diverted from the purpose for which it was originally collected. The word 'diverted' is used in the sense of turning permanently from its purpose, the equivalent of appropriation for some other use. A temporary transfer from the general fund to another fund with an assured income is not an appropriation or diversion. With its outstanding credit against the other fund, the assets of the general fund remain the same, and its power to accomplish general municipal purposes has not been decreased. The city controls both funds and it is under the legal obligation to see that the general fund is seasonably reimbursed from the source of supply to the special one. Of course the city authorities must exercise common business sense in making such transfer. As a personal loan of magnitude is not ordinarily made to an individual who is insolvent, so a city should not transfer its general fund moneys as temporary loans to other funds that have not assured and certain sources of income, the collection of which is under the control of the city itself.''

The next case is *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467, which follows the *Griffin* case. It appears in the *Scott* case that moneys received as franchise taxes were to be loaned to a special fund. Presumably, money collected as franchise taxes belongs to the general fund, and, nothing to the contrary appearing, it is fair to assume that it had not been pledged to secure other particular indebtedness. At least, nothing of that kind seems to have been brought to the attention of the court. Incidentally, a strong dissenting opinion appears in the *Scott* case, not differentiating that case from the *Griffin* case, but calling for the overruling of the *Griffin* case.

The only other case on the subject which has been called to our attention is *Seymour v. Ellensburg,* 81 Wash. 365, 142 Pac. 875, which again followed the

*Griffin* case, and which also involved a loan from the general fund to a special fund.

It can hardly be seriously contended that what was said in the *Griffin* case was intended to authorize what has been done in this case. The court there sanctioned a mere temporary transfer to meet an actual emergency and expressly condemned an appropriation or diversion. Here is no temporary emergency, but a continuing condition, and, by the practice indulged in, the street railway system has in effect acquired permanent capital by means of which it carries on its business.

No case is called to our attention, none is cited by the majority, and I doubt if any authority can be found, which holds that money held in trust for bond and warrant holders in a special fund can be, even temporarily, diverted or loaned to another special fund. To countenance such a proceeding would greatly enlarge the doctrine of the cases just cited, and I am now of the opinion that this court went to the extreme limit in those cases, and that any further extension of the doctrine would be unwarranted.

As to such special funds as the water and light funds of the city of Seattle, although wholly solvent, which are pledged to a specific purpose (and these funds must be so pledged, since appellant holds an obligation against each, payable only out of such fund), the city stands in the position of a trustee charged with all of the duties and responsibilities which devolve upon an individual or a private corporation who undertakes a like trust.

"A trustee holds the trust estate for the *cestui que* trust, and to effect the purposes and objects declared by the trust instrument, and it is incumbent on him to preserve and protect the trust property for all the beneficiaries, and to administer it strictly in compliance

with the terms of the trust. Failing to perform this duty, he is liable for any injury sustained by any person beneficially interested. He may be enjoined from committing a breach of trust, . . ." 26 R. C. L. 1281.

See, also, Perry on Trusts (7th ed.), §§ 427-463.

We know of nothing in the statutes of this state under which these special funds are established, that authorizes or empowers the city to deal with any of them in any manner save only to effectuate the purpose for which the particular fund is created, and since these trusts, like all others, must be administered strictly in compliance with the statutory directions which are the trust instruments, there can be no implied power to deviate. How, then, can we put the seal of approval upon the course the city is pursuing?

As we have already seen, the so-called temporary loans have been increasing in amount. Each one that has been paid has been paid in part by the proceeds of a new loan of similar character, and the result is that the street railway system is being operated upon permanent capital thus obtained. Should we approve what has already been done, the door would be opened wide to every special fund which the city has or may establish, and, by borrowing from one to pay another, the railway system might be carried on indefinitely on capital thus borrowed, and eventually the moneys of any or all such special funds might be absorbed to the loss of some, or all, of those for whose benefit the particular funds have been pledged.

In the *Asia* case, *supra,* in discussing a similar question governed by the same principle, we said:

"Here we have a special fund which owes many millions, a considerable deficit appeared almost immediately, and has steadily grown. None of the efforts of the city so far have resulted in providing an income sufficient to meet the outgo. If borrowing is

continued, either directly or by overdraft, the final result will inevitably be that the moneys borrowed will be permanently diverted from the fund to which they belong and appropriated to the use of the utility, just as certainly as though such an appropriation were directly made in the first place. That which may not be done directly must not be accomplished by indirection. When, as here, the court can certainly see a final unlawful result, it should enjoin the act by which the unlawful result will otherwise be accomplished.''

I think that language equally applicable to the present question, and that rule still a wholesome one, hence, the attempt to emphasize by repetition.

If these views are sound, then the money used to pay the warrants held by appellant was illegally diverted from other special funds, and, as appellant was not a willing participant in the illegal act, he was not thereby deprived of his right to litigate the question. And more than that, it must be borne in mind that appellant sues also as a holder of bonds payable only out of the depleted special funds and as a citizen and a taxpayer. In either role, he is entitled to be heard upon the other question in the case. Indeed, the city argues only that his right as a citizen and a taxpayer, while otherwise existing, is cut off, because, in the *Twichell* case, the issues which he now presents in his first cause of action were decided adversely to his present contentions and therefore that the *Twichell* case is *res adjudicata*.

In view of the somewhat astounding interpretation which the city places upon the *Twichell* case, and which it seems to have impressed upon the Federal courts in the cases cited by the majority, the subject ought to be again reviewed. In passing, we may say that it is our duty and privilege to interpret our statutes, and our interpretation of our statutes is binding upon the Federal courts, not theirs on us.

The *Twichell* case was instituted, tried below, appealed and decided by this court before the city took over and began the operation of the system. There was then no operating expense, and no debt arising from operations was in existence. The sole purpose and intent of the appellants in that case was to secure a judicial determination of the question whether or no the contract under consideration created general obligations against the city which could become effective only by submission to, and approval by, the voters. This court there set forth the issue in these words:

"Appellants contend, however, that because of certain provisions of the ordinances and of the statute, now to be noticed, a general indebtedness is contemplated or involved; and also, that the proposed transaction may not be consummated without the ratification of the voters. If the completion of the purchase and sale as planned would create a general debt, it would doubtless require the sanction of the voters of the city, otherwise not so."

It is true that an argument was advanced in the *Twichell* case, based upon § 5 of Ordinance No. 39025, by which the city attempted to pledge the gross revenues of the system to the payment of the purchase money bonds,

" . . . even though the balance of such gross receipts thereafter remaining may be insufficient to pay the cost of maintaining and operating said system and said additions and betterments thereto and extensions thereof,"

in violation, it was urged, of the plain command of Rem. Code, § 8008.

Without unduly lengthening this dissent by setting out all that the court had to say upon that subject, it must suffice to say that the gist of the court's reasoning was to the effect that, the city council having declared that the bonds should be payable only out of the

special fund and that the special fund would be sufficient to pay the bonds and all of the proper charges, the courts must assume that the city council had acted fairly and honestly, and had reached a correct conclusion upon a subject which the statute submits to its discretion. The court there said:

"Now, having adopted that plan, it became necessary, under the directions and mandate of § 8008 of the code, in *creating* the special fund and specifying the amount to be set aside into it to be used in paying for the utility, to have due regard to the cost of operation and maintenance of the system as constructed or added to and to any proportion or part of the revenues previously pledged, and not to set aside into such special fund a greater amount than in the judgment of the city council will be available over and above the cost of operation and maintenance and revenues previously pledged. . . .

"The *'due regard'* clause of the statute is a guide to point the way—a curb or limitation upon the manner in which the city council shall exercise its judgment in determining the fixed amount of the gross revenues derived from the utility to constitute the special fund for the payment of the utility. The finding, and expression of judgment of the city council in that portion of the ordinance just above set out, reflects observance of the *'due regard'* clause of the statute; and when the city council has thus proceeded and determined, it has exhausted its power with reference to the creation of the special fund, and the contract becomes fixed and settled as against that fund. Whether or not the ordinance and bonds provide for a preference in favor of the bonds and interest out of the gross revenues of the system is unimportant to the integrity of the obligations, as demands upon the special fund, because the latter part of § 8008 of the code covers the matter: . . ."

Special attention is called to the words:

"Whether or not the ordinance and bonds provide for a preference in favor of the bonds and interest out

of the gross revenues of the system is unimportant to the integrity of the obligations, as demands upon the special fund, because the latter part of § 8008 of the code covers the matter, . . .''

Thus it will be seen that the court clearly recognized that the contract must be considered in the light of the statute, and that the city council had no power to go beyond the limit fixed by the legislature. In § 8008, it is provided:

"In creating any such special fund or funds the common council or other corporate authorities of such city or town shall have due regard to the cost of operation and maintenance of the plant or system as constructed or added to, and to any proportion or part of the revenue previously pledged as a fund for the payment of bonds, warrants, or other indebtedness, and shall not set aside into such special fund a greater amount or proportion of the revenue and proceeds than in their judgment will be available over and above such cost of maintenance and operation and the amount or proportion, if any, of the revenue so previously pledged.''

That is a direct limitation upon the power of the city council, and any attempt to go beyond the limit so fixed by the legislature is necessarily *ultra vires* and void. If we did not say so in unequivocal language in the *Twichell* case, it was only because the question did not there arise, could not have existed under the then conditions, and nothing was before the court which would justify it in deciding a question which, if the city council was right in its conclusions as to the facts, never could arise at any time. In other words, the city council expressly found in § 2 of Ordinance No. 39025:

"The gross revenues to be derived from the operation of the municipal street railway system of the city of Seattle, including the additions and betterments to, and extensions thereof, herein provided for, at the rates of transportation charged, and to be charged, upon the entire system, will be sufficient in the judg-

ment of the council and of the corporate authorities of the city to meet all expenses of operation and maintenance, including the operation and maintenance of the proposed additions, betterments and extensions, and to provide all proportions or parts of revenues previously pledged as a fund for the payment of bonds, warrants and other indebtedness, with interest thereon, heretofore made payable out of the revenues of the existing municipal street railway system, and to permit the setting aside in a special fund, out of the gross revenues of the entire system, amounts sufficient to pay the interest on the bonds hereby authorized to be issued, as such interest becomes due and payable, and to pay and redeem all of such bonds at maturity.''

This court accepted that finding, as it was then compelled to do, and could not anticipate that a conflict would ever arise as to priority between operating expenses and the purchase money bonds.

If, in spite of my demonstration to the contrary, the language of the *Twichell* case is thought to be ambiguous, then that ambiguity was promptly cleared up by the *Asia* case wherein it was said:

''There has developed from the operation a condition which establishes beyond cavil that the city council was in error when, by Ordinance No. 39,025, considered in the *Twichell* case, it declared that, in its judgment and in the judgment of the corporate authorities, the gross revenues from such operation would be sufficient to meet all expenses of operation and maintenance, provide for revenues previously pledged, and permit the setting aside in a special fund of amounts sufficient to meet the interest and principal of the bonds given in payment, according to the terms agreed upon; a declaration which we were then compelled to accept at its face value, and upon which the result in the *Twichell* case is based. . . .

''Without discussing the authorities there reviewed, or repeating the arguments of or quoting from the *Twichell* case, it is sufficient to say that we there held

that the judgment of the city council was conclusive and must be accepted by us until the contrary appeared, and therefore, by the ordinance providing for the acquisition and operation of the street railway system, no general indebtedness was created."

Just why the city persistently ignores this unmistakable language from the *Asia* case is incomprehensible. The *Asia* case was heard *En Banc,* as was the *Twichell* case, and eight members of the court concurred therein. Notwithstanding the fact that the hand that pens this dissent, wrote the opinion of the court in the *Asia* case, still, by the concurrence of seven others, the opinion became the opinion of this court and will stand as such until overruled.

It is clear, then, that, by the statute and by our previous decisions, operating expenses must be paid before money is diverted to the payment of the bonds. The law of economics is no less plain. Unless operating expenses are paid, operations must soon cease, and the loss to the holders of the purchase money bonds will in that event be much greater than if they are content to receive what remains after operating expenses are paid.

It therefore is apparent that, upon the question now presented, the *Twichell* case is not *res adjudicata.*

The recipient of the bonds and those purchasing from it are presumed to know the statute law of the state and are bound thereby. Hence, we should unhesitatingly hold that the cost of maintenance and operation, together with any part of the revenue previously pledged, take priority over the purchase money bonds as the statute, by its terms, so clearly provides.

To the extent herein indicated, appellant was, in my judgment, entitled to prevail, and therefore the judgment of the trial court should be reversed with direc-

tions to enter judgment against the city in harmony with these views.

PARKER, J., concurs with TOLMAN, J.

MITCHELL, C. J. (dissenting)—I am inclined to the opinion expressed in Judge Tolman's dissent, that the doctrine of *Griffin v. Tacoma,* 49 Wash. 524, 95 Pac. 1107, and other of our cases referred to on that subject, is not applicable to the present case. I especially concur in that portion of his dissenting opinion in which he expresses the meaning of the cases of *Twichell v. Seattle,* 106 Wash. 32, 179 Pac. 127, and *Asia v. Seattle,* 119 Wash. 674, 206 Pac. 366.